**PROSPER LAW GROUP, LLP**
Gordon F. Dickson, Esq., SBN 136857
Deborah P. Gutierrez, Esq., SBN 240383
Michael E. Thompson, Esq., SBN 266275
6100 Center Drive, Suite 1050
Los Angeles, California 90045
Telephone:   (310) 893-6200
Facsimile:   (310) 988-2930
Email:        deborah@prosperlaw.com

Attorneys for Plaintiff,
Margaret S. Wise

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARGARET S. WISE, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>WELLS FARGO BANK, N.A.; U.S. BANK, N.A. AS TRUSTEE FOR CITIGROUP MORTGAGE LOAN TRUST, INC., MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-AR9; and Does 1 – 10, inclusive,<br><br><br><br>Defendants. | Case No. CV11-8586 CBM (PJWx)<br><br>**FIRST AMEDED COMPLAINT FOR:**<br><br>1. **DECLARATORY RELIEF [28 U.S.C. §§ 2201, 2202]**<br>2. **NEGLIGENCE**<br>3. **QUASI CONTRACT**<br>4. **VIOLATION OF 15 U.S.C. § 1692e**<br>5. **VIOLATION OF 15 U.S.C. § 1641(g)**<br>6. **VIOLATION OF 12 U.S.C. § 2605**<br>7. **VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200, ET SEQ.**<br>8. **ACCOUNTING**<br>9. **BREACH OF CONTRACT**<br>10. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>11. **VIOLATON OF CALIFORNIA CIVIL CODE 2923.5 AND 2924**<br><br>**DEMAND FOR JURY TRIAL** |

FIRST AMENDED COMPLAINT                                                                                    -1-

# TABLE OF CONTENTS

I. STATEMENT OF THE CASE.................................................................3

II. JURISDICTION, VENUE, AND PARTIES.............................................4

III. FACTUAL ALLEGATIONS..................................................................6

IV. FIRST CAUSE OF ACTION – DECLARATORY RELIEF: TO DETERMINE STATUS OF DEFENDANTS' CLAIMS [28 U.S.C. §§ 2201, 2202]............................13

V. SECOND CAUSE OF ACTION – NEGLIGENCE.................................15

VI. THIRD CAUSE OF ACTION – QUASI CONTRACT...........................16

VII. FOURTH CAUSE OF ACTION – VIOLATION OF 15 U.S.C. § 1692e.......17

VIII. FIFTH CAUSE OF ACTION – VIOLATION OF 15 U.S.C. § 1641(g)........20

IX. SIXTH CAUSE OF ACTION – VIOLATION OF 12 U.S.C. § 2605...........23

X. SEVENTH CAUSE OF ACTION – BUS. AND PROF. CODE SECTION 17200, ET SEQ......25

XI. EIGHTH CAUSE OF ACTION – ACCOUNTING.................................29

XII. NINTH CAUSE OF ACTION – BREACH OF CONTRACT....................30

XIII. TENTH CAUSE OF ACTION – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.....................................................................32

XIV. ELEVENTH CAUSE OF ACTION – VIOLATION OF CALIFORNIA CIVIL CODE SECTIONS 2923.5 AND 2924......................................................34

# COMPLAINT

COMES NOW Plaintiff Margaret S. Wise ("Plaintiff" or "Ms. Wise"), by and through her counsel, for her Complaint against Defendants Wells Fargo Bank, N.A. (in its capacity as originating lender and purported mortgage servicer) (hereinafter "**Wells Fargo**" as originating lender and "**WFHM**" as purported servicer ) and U.S. Bank, N.A. as trustee for Citigroup Mortgage Loan Trust, Inc., Mortgage Pass-through Certificates, Series 2006-AR9 (in its capacity as purported assignee of Plaintiff's Deed of Trust) (hereinafter "**U.S. Bank**"), (collectively "Defendants"), plead as follows:

## I.   STATEMENT OF THE CASE

1.     On June 26, 2006, Plaintiff executed a promissory note ("Note") in favor of Wells Fargo, in the amount of $940,000 secured by a deed of trust ("Deed of Trust" or "Mortgage") for the finance of real property located at 2009 Ernest Avenue, Redondo Beach, California 90278.   Subsequently, Defendants failed to properly assign or transfer Plaintiff's Note to U.S. Bank resulting in Defendants' inability to collect on the Note and enforce the Deed of Trust.  Despite Defendants' failure to perfect a security interest, U.S. Bank and its agents have attempted to collect on this Note and enforce the Deed of Trust with the knowledge that they have no legal right to do so.  In addition to violating the Fair Debt Collection Practices Act, the Truth in Lending Act, and the Real Estate Settlement Procedures Act, Defendants knowingly concealed their lack of an enforceable security interest by fabricating and recording false documents in the Los Angeles County Recorder's Office.  Defendants' conduct is not only unfair and fraudulent, but also constitutes a violation of California Penal Code section 532(f)(a)(4).[1]  Through this action, Plaintiff seeks damages resulting from Defendants' unlawful conduct and a declaratory judgment establishing that Defendants have failed to substantiate a perfected security interest in the Note and Deed of Trust (collectively

---

[1] Defendants' recording of the Assignment of Deed of Trust violates Cal. Penal Code section 532(f)(a)(4), which prohibits any person from filing a document related to a mortgage loan transaction with the county recorder's office which that person knows to contain a deliberate misstatement, misrepresentation, or omission.

1  referred to as "Loan").  Simply put, Defendants have no legal, equitable, or pecuniary

2  interest in the Note and Deed of Trust.

3     2.     In the alternative, if the Court finds that any of the Defendants have an

4  enforceable security interest in either the Note or Deed of Trust, Plaintiff maintains that

5  Defendants have breached Section 2 of the Deed of Trust and the Implied Covenant of

6  Good Faith and Fair Dealing, by charging improper fees and miscalculating and

7  misapplying payments to offset both principal and interest, in addition to the statutory

8  provisions listed above.

9  **II.   JURISDICTION, VENUE, AND PARTIES**

10     3.     This Court has original jurisdiction over the claims in this action based on

11  28 U.S.C. §§ 1331, 1343, 15 U.S.C. § 1692, 15 U.S.C. § 1641(g), 12 U.S.C. § 2605, and

12  42 U.S.C. § 1983 which confer original jurisdiction on federal district courts in suits to

13  address the deprivation of rights secured by federal law.

14     4.     This Court also has supplemental jurisdiction over the pendant state law

15  claims because they form a part of the same case or controversy under Article III of the

16  United States Constitution, pursuant to 28 U.S.C. § 1367.

17     5.     This Court has original jurisdiction over the claims in this action based on

18  28 U.S.C. § 1332 which confers original jurisdiction on federal district courts in suits

19  between diverse citizens that involve an amount in controversy in excess of $75,000.

20     6.     The unlawful conduct, illegal practices, and acts complained of and alleged

21  in this Complaint were all committed in the Central District of California and involved

22  real property that is located in the Central District of California.  Therefore, venue

23  properly lies in this District, pursuant to 28 U.S.C. § 1391(b).

24     7.     Plaintiff is now, and at all times mentioned herein, an individual residing in

25  the County of Los Angeles.  At all times relevant to this action, Plaintiff has owned real

26  property commonly known as 2009 Ernest Avenue, Redondo Beach, California, 90278

27  (the "Property").  Further described as Assessor's Parcel Number 4150-019-016, with

28  the following legal description:

FIRST AMENDED COMPLAINT                                                    -4-

All that certain real property situated in the County of Los Angeles, State of California, described as follows: Lot 17 in Block 31 of Redondo Villa Tract "B", in the City of Redondo Beach, County of Los Angeles, State of California, as per map recorded in Book 11, Page(s) 110, of Maps, in the Office of the County Recorder of said County.

8. At all relevant times, **Wells Fargo Bank, N.A.** is a national association organized under the laws of the United States with its main office in South Dakota.

9. At all relevant times, **U.S. Bank, N.A.** as Trustee for Citigroup Mortgage Loan Trust, Inc., Mortgage Pass-through Certificates, Series 2006-AR9, is a national banking association with its main office in Minnesota.

10. Plaintiff is ignorant of the true identity and capacity of Defendants designated as Does 1 - 10, but will amend the Complaint when their identities have been ascertained according to proof within the time permitted. However, Plaintiff alleges on information and belief, that each and every Doe Defendant is in some manner responsible for the acts and conduct of the other Defendants, and were, and are, responsible for the injuries, damages, and harm incurred by Plaintiff. Plaintiff further alleges on information and belief that each such designated Defendant acted, and acts, as the authorized agent, representative, and associate of the other Defendants in doing the things alleged herein.

11. Whenever reference is made in this Complaint to any act of any Defendant(s), that allegation shall mean that each Defendant acted individually and jointly with the other Defendants.

12. Any allegation about acts of any corporate or other business Defendant(s) means that the corporation or other business did the acts alleged through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

13. At all relevant times, each Defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Additionally, some or all of the Defendants acted as the agent of the other

1   Defendants, and all of the Defendants acted within the scope of their agency if acting as

2   an agent of the other.

3          14.     At all relevant times, each Defendant knew or realized that the other

4   Defendants were engaging in or planned to engage in the violations of law alleged in

5   this Complaint.  Knowing or realizing that the other Defendants were engaging in or

6   planning to engage in unlawful conduct, each Defendant nevertheless facilitated the

7   commission of those unlawful acts.  Each Defendant intended to and did encourage,

8   facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted

9   the other Defendants in the unlawful conduct.

10  ### III.    FACTUAL ALLEGATIONS

11         15.     On or about June 26, 2006, Margaret S. Wise executed a Note and Deed of

12  Trust (hereinafter "Mortgage" or "Deed of Trust") in favor of Wells Fargo, obtaining a

13  Loan on the Property.

14         16.     On information and belief, Plaintiff alleges that sometime after the

15  origination of her Loan, Wells Fargo attempted to sell her Loan to another entity or

16  entities.

17         17.     Plaintiff alleges that these unknown entities and Defendants were involved

18  in an attempt to securitize her Loan into the Citigroup Mortgage Loan Trust, Inc.,

19  Mortgage Pass-through Certificates, Series 2006-AR9 ("Citigroup Trust").  *See* **Exhibit**

20  **"A",** attached hereto is a securitization flow chart depicting the securitization process.

21  In order for Plaintiff's Mortgage to be a part of the Citigroup Trust, the entities involved

22  were required to follow various agreements and established laws, including the Trust

23  Agreement that governed the creation of the Trust.  Plaintiff alleges the entities involved

24  in the attempted securitization of Plaintiff's Loan failed to adhere to the requirements of

25  the Trust Agreement necessary to properly assign the mortgage loan into the Trust.  As a

26  result, Plaintiff's Loan was not assigned to the Citigroup Trust and is therefore not part

27  of the Trust res as a matter of New York trust law.  This fatal defect renders Defendants

28  third-party strangers to the underlying debt obligation without the power or right to

FIRST AMENDED COMPLAINT                                                              -6-

1    demand payment, declare default, negotiate her Loan, and foreclose on her Property.

2    Although Defendants are aware of this fact, they have and continue to act as if they have

3    authority to demand payment, declare default, negotiate her Loan, and foreclose on her

4    Property.  Plaintiff specifically disputes these facts.

5         18.     Plaintiff timely paid her mortgage payments until 2008 when she began

6    experiencing an unforeseen financial hardship.  In 2008, Plaintiff initiated loan

7    modification negotiation efforts with WFHM after her mortgage rate became

8    unaffordable.  After submitting her loan modification packet many times over, Plaintiff

9    was denied a loan modification on several occasions due to alleged non-responsiveness,

10   not enough income and "outside investor guidelines."

11        19.     Plaintiff's investigation has confirmed that there was an **attempt** to

12   securitize the Mortgage by assigning and transferring the Mortgage into the Citigroup

13   Trust, but the mortgage loan was never actually assigned and transferred to the

14   Citigroup Trust.

15        20.     In fact, Plaintiff alleges that the Mortgage was never assigned or transferred

16   to any of the parties involved in the securitization process.  Specifically, Plaintiff alleges

17   that her Note and Mortgage were never assigned to the Sponsor, Depositor, the

18   Citigroup Trust, or any of the Defendants as required by the Trust Agreement (a.k.a. the

19   Pooling and Servicing Agreement).

20        21.     Plaintiff's information and belief is based on (1) a title report and analysis

21   of the Property's county records; (2) direct written and oral communication with

22   Defendants; (3) her counsel's research, experience, and extensive review of depositions,

23   case law, amicus briefs, correspondence, news articles, reports, complaints by Attorneys

24   General from various states, and publicly available securitization documents and

25   practices; (4) a review of a purported "Assignment of Deed of Trust," executed by

26   "Carla Naughton"; and (5) an audit of U.S. Bank's filings with the Securities and

27   Exchange Commission ("SEC"), including U.S. Bank's 424B5 Prospectus and Pooling

28   and Servicing Agreement ("PSA").

FIRST AMENDED COMPLAINT

22.     Plaintiff's allegations are further supported by a forensic loan audit (the "Audit") conducted by Marie McDonnell, of McDonnell Property Analytics, Inc., a nationally renowned securitization forensic auditor.[2] *See* **Exhibit "B"**, a true and correct copy of the Audit on Plaintiff's Property. Based on Ms. McDonnell's research, Plaintiff was able to confirm that her mortgage loan was never properly assigned into the Citigroup Trust and that the parties involved in the securitization process failed to comply with Section 2.01 of the Trust Agreement.

23.     Plaintiff alleges that the Mortgage was not properly assigned to the Citigroup Trust on or before November 30, 2006, the required "Closing Date," as set forth in the Trust Agreement. The "Closing Date" is the date by which all of the notes and mortgages must be transferred into the Citigroup Trust in order for the mortgage loan to be a part of the trust res. As such, Ms. Wise's Loan was never, and has never been, part of the Citigroup Trust res. *See* **Exhibit "C"**, attached hereto is a true and correct copy of section 2.01 and 2.02 of the Trust Agreement containing these important requirements. As such, Ms. Wise's Loan was never, and has never been, part of the Citigroup Trust res.

24.     In further violation of Section 2.01 of the Trust agreement, Defendants failed to deposit specific documents, such as all endorsed promissory notes, the original recorded mortgage, and an assignment to the Trustee with the Custodian of Records of the Citigroup Trust. These documents were required to be deposited in order to complete the assignment and transfer of Plaintiff's Note and Mortgage to the Trust.

---

[2] Marie McDonnell is a credentialed Certified Fraud Examiner who submitted an amicus brief which was critical to the recent decision in *U.S. Bank vs. Ibanez*, 458 Mass. 637 (2011). In *Ibanez*, the Massachusetts Supreme Judicial Court invalidated two foreclosure sales, finding that the U.S. Bank and Wells Fargo failed to demonstrate that they were the holders of securitized mortgages at the time of foreclosure. The court rejected the banks' argument that the mortgages were transferred via the applicable Pooling and Servicing Agreement and made clear that, to foreclose, the banks must prove a complete and unbroken chain of title from origination to securitization trust in full compliance of the PSA, i.e. establish ownership of the mortgage. *Id.* at 637. More recently, Ms. McDonnell submitted an amicus brief in support of the plaintiff's position in *Eaton v. Federal National Mortgage Association, et al.*, SJC-11041 (Mass. 2011). The court has not yet ruled on the arguments heard on October 3, 2011.

25.     Despite this failure to assign, transfer, and grant Plaintiff's Mortgage to U.S. Bank, Defendants have made numerous attempts to collect on Plaintiff's mortgage.

26.     Defendants attempted to cover-up their failure to properly assign, transfer, or grant Plaintiff's Mortgage by purportedly executing and recording a fabricated Assignment of Deed of Trust (the purported "Assignment"). *See* **Exhibit "D,"** attached hereto is a true and correct copy of the Assignment of Deed of Trust, recorded on or around August 16, 2011.

27.     Prior to recording the assignment, Defendants recorded a purported Notice of Default. *See* **Exhibit "E,"** attached hereto is a true and correct copy of the Notice of Default, recorded on or around August 10, 2011.

28.     On or around August 11, 2011, First American Trustee Servicing Solutions, LLC (hereinafter "First American"), sent Plaintiff a letter (the "First American Letter") identifying Wells Fargo as the "current creditor to whom the debt is owed" and stating that First American "has been authorized by the Servicer/Creditor to initiate foreclosure proceedings." *See* **Exhibit "F,"** attached hereto is a true and correct copy of the First American Letter.

29.     The Assignment purports that "for value received, [Wells Fargo] hereby grants, assigns, and transfers" to U.S. Bank as Trustee the Citigroup Trust "all beneficial interest" under the Deed of Trust. The Assignment was purportedly signed by "Carla Naughton" as "Vice President Loan Documentation" for Wells Fargo. The assignment was purportedly executed on July 19, 2011, and notarized that same day. It was recorded on August 16, 2011. On information and belief, Plaintiff alleges that no such transfer ever occurred; "Carla Naughton" was not, and is not, an employee of Wells Fargo; and the document is fabricated. Plaintiff disputes the document's authenticity. Plaintiff's belief is supported by the following:

   a) The Assignment was purportedly signed by Carla Naughton as Vice President Loan Documentation for Wells Fargo. However, a declaration accompanying the Notice of Default was purportedly signed two days later,

on July 21, 2011, by "Shakanda L. Byers" as "VP of Loan Documentation" for Wells Fargo. *See* Exhibit E, Notice of Default Declaration.

b) The Assignment, which purports to transfer all beneficial interest in Plaintiff's Loan to U.S. Bank, is contradicted by the First American Letter, sent almost one month later on August 11, 2011, which identified the "current creditor" as Wells Fargo. *See* Exhibit F.

c) The Assignment was purportedly executed almost five years after the Closing Date of the Citigroup Trust, in violation of the PSA and New York trust law.

d) The inconsistencies detailed with the Assignment and with other documents evidence a plan to "paper over" Defendants' lack of a beneficial interest in Plaintiff's Loan by filing fabricated documents.

30.    The Notice of Default was purportedly executed by Wendy Randall of First American on August 5, 2011.  The Notice of Default was recorded on August 10, 2011. Accompanying the Notice of Default is a Notice of Default Declaration which was purportedly executed on July 21, 2011, by "Shakanda L. Byers" as "VP of Loan Documentation" for Wells Fargo.  On information and belief, Plaintiff alleges that the Notice of Default is defective; "Shakanda L. Byers" was not, and is not, an employee of Wells Fargo; and the declaration is fabricated.  Plaintiff disputes the declaration's authenticity.  Plaintiff's belief is supported by the following:

a) The declaration was purportedly signed by Shakanda L. Byers as Vice President of Loan Documentation for Wells Fargo.  However, the Assignment was purportedly signed two days earlier, on July 19, 2011, by "Carla Naughton" as "VP Loan Documentation" for Wells Fargo. *See* Exhibit D.

b) The First American Letter states that First American is acting pursuant to the authority of Wells Fargo as the "current creditor," but Wells Fargo had

purportedly assigned all beneficial interest under the Deed of Trust to U.S. Bank almost a month earlier. *See* Exhibits D, F.

    c) The inconsistencies detailed with the Assignment and with other documents evidence a plan to "paper over" Defendants' lack of a beneficial interest in Plaintiff's Loan by filing fabricated documents.

31.    On August 21, 2011, in an effort to verify and validate her debt, Ms. Wise sent WFHM a Qualified Written Request ("QWR") letter pursuant to Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e), in which she requested that the purported servicer WFHM provide information pertaining to her Loan. *See* **Exhibit "G"**, attached hereto is a true and correct copy of Plaintiff's Qualified Written Request. Although the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd Frank Act")[3] requires that the servicer provide an acknowledgement of receipt of the QWR within 5 days of receiving it and to further respond within 30 business days of receipt. WFHM has yet to respond.

32.    Plaintiff relied on the representations made by Defendants that the lender was her true creditor with the power to collect payment and modify her loan. Presently, Plaintiff is aware that none of the Defendants have any legal authority to engage in debt collection activities against her.

33.    Plaintiff does not dispute that she owes money on her mortgage obligation. Rather, Plaintiff disputes the amount owed and seeks the Court's assistance in determining who the true creditor is of her Note and Deed of Trust.

---

[3] The Dodd-Frank Act was signed into law on July 21, 2010. The Act amended several statutes including 12 U.S.C. § 2605. The Act amended 12 U.S.C. § 2605 by shortening the deadline to acknowledge a QWR from fifteen days to only five days and shortening the substantive response deadline from sixty days to thirty days. There is a fifteen day extension allowed if the borrower is notified of the extension and the reasons for the delay. In addition, the Dodd-Frank Act requires a servicer of a federally related mortgage to "respond to a QWR within 10 business days to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan." H.R. 4173 section 1463(a). The Dodd-Frank Act provides available damages to an individual for failing to respond to a QWR request. Available damages were increased from actual damages plus $1,000.00 to actual damages plus $2000.00. The Dodd-Frank Act also prohibits various servicing practices and made a few changes to TILA.

34.     Plaintiff has been paying the wrong creditor and all payments made to the Citigroup Trust must be disgorged and refunded.

35.     Plaintiff has been damaged as her credit and credit score were severely damaged.

36.     The title to Plaintiff's home has been slandered, clouded, and its salability has been rendered unmarketable.

37.     Plaintiff must seek the Court's assistance to identify her true creditor as she risks not obtaining clear title to this property should she be able to workout a payment plan or forbearance.

38.     Plaintiff does not know who the current beneficiary of her Note and Mortgage actually is, such that she is now subject to double financial jeopardy.

39.     Plaintiff has been paying the wrong party for an undetermined period of time and seeks that Defendants return monies not owed to them.

40.     Plaintiff has offered to and is ready, willing, and able to unconditionally tender her obligation.[4]

41.     Not only is Plaintiff ready, willing, and able to tender her obligation, but she is also gainfully employed and has the ability to pay a reasonable payment to fulfill her obligation.

---

[4] Case law makes clear that **Plaintiff is only required to allege a credible offer of tender**, not actually tender. *Alicia v. GE Money Bank*, No C 09-00091 SBA, 2009 WL 2136969 at *3 (N.D. Cal. July 16, 2009) ("…debtor must allege a credible tender of the amount of the secured debt…"). Moreover, tender is *not* required when the owner's action attacks the validity of the underlying debt because the tender would constitute an affirmation of the debt. *Sacchi v. Mortgage Electronic Registration Systems, Inc.*, No. CV 11-1658 AHM, 2011 WL 2533029 at *16 (C.D.Cal June 24, 2011) (emphasis added) citing *Onofrio v. Rice*, 55 Cal. App. 4th 413, 424 (1997); *Stockton v. Newman*, 148 Cal. App. 2d 558, 564 (1957). *See also Foulkrod v. Wells Fargo Financial California Inc.*, No. CV 11-732-GHK (AJWx) (C.D. Cal. May 31, 2011) ("…requiring plaintiff to tender the amount due on his loan at this time would be illogical and inequitable given that he disputes that Wells Fargo has any rights under the loan."). In light of the fact that Plaintiff contests the legitimacy of the Defendants' claim to the mortgage payments, it would be *illogical and inequitable* to require Plaintiff to actually tender the amount given that Plaintiff disputes whether Defendants have any rights under the loan. *See Onofrio v. Rice*, 55 Cal. App. 4th 413, 424 (1997).

# FIRST CAUSE OF ACTION – DECLARATORY RELIEF: TO DETERMINE STATUS OF DEFENDANTS' CLAIMS [28 U.S.C. §§ 2201, 2202]

## [Against All Defendants and Doe Defendants]

42.     Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

43.     Section 2201(a) of Title 28 of the United States Code states:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

44.     Section 2202 of Title 28 of the United States Code states:

> Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.[5]

45.     On or around July 19, 2011, U.S. Bank claimed it was assigned and transferred a secured enforceable interest in, and a perfected lien against the Plaintiff's Note, Deed of Trust, and Property.

46.     Defendant WFHM has been collecting payments on behalf of Defendant U.S. Bank for a debt in which they have no interest.

47.     Plaintiff alleges that Defendants do not have a secured or unsecured legal, equitable, or pecuniary interest in the lien evidenced by the Deed of Trust and that its purported Assignment has no value since the Deed of Trust is wholly unsecured.

---

[5] It is axiomatic that a cause of action for declaratory relief serves the purpose of adjudicating *future* rights and liabilities between parties. *See Cardellini v. Casey*, 181 Cal. App. 3d 389 (1986) [Emphasis added]; *Bachis v. State Farm Mutual Auto. Ins. Co.*, 265 Cal. App. 2d 722 (1968).

FIRST AMENDED COMPLAINT                                                                -13-

48.     Thus, the competing allegations made by Plaintiff and Defendants, above, establish that a real and actual controversy exists as to the respective rights of the parties to this matter, including ownership of the Property.[6]

49.     In addition, the harm by Defendants is ongoing and includes the imminent foreclosure of Plaintiff's home.  Therefore, as this claim relates to future harm, Plaintiff's declaratory relief claim is cognizable as an independent cause of action.[7]

50.     Accordingly, Plaintiff requests that the Court make a finding and issue appropriate orders stating what interest, if any, any of the named Defendants or Doe Defendants have in Plaintiff's Note, Deed of Trust, or the Property which authorizes them, in fact or as a matter of law, to collect Plaintiff's mortgage payments or enforce the terms of the Note or Deed of Trust in any manner whatsoever.

51.     Plaintiff will suffer prejudice if the Court does not determine the rights and obligations of the parties because:  (1) Plaintiff will be denied the opportunity to identify her true and current creditor/lender and negotiate with them; (2) she will be denied the right to conduct discovery and have U.S. Bank's and WFHM's claims verified by a custodian of records who has personal knowledge of the loan and all transactions related to it; and (3) she will be denied the opportunity to discover the true amount she still owes minus any illegal costs, fees, and charges.

52.     Due to the actual case and controversy regarding competing claims and allegations, it is necessary that the Court declare the actual rights and obligations of the parties and make a determination as to whether U.S. Bank's and WFHM's claims

---

[6] "Declaratory relief is only appropriate '(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir. 1986).

[7] *See Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1405 (9th Cir. 1996)("A declaratory judgment offers a means by which rights and obligations may be adjudicated in cases brought by any interested party involving an actual controversy that has not reached a stage at which either party may seek a coercive remedy and in cases where a party who could sue for coercive relief has not yet done so.").

1  against Plaintiff are enforceable and whether they are secured or unsecured by any right,

2  title, or interest in Plaintiff's Property.

3      53.    Furthermore, the conduct of U.S. Bank, WFHM, and/or one or more of the

4  Doe Defendants, and each of them, as herein described, was so malicious and

5  contemptible that it would be looked down upon and despised by ordinary people.

6  Plaintiff is therefore entitled to punitive damages in an amount appropriate to punish

7  Defendants and to deter others from engaging in similar conduct.

## SECOND CAUSE OF ACTION - NEGLIGENCE

### [Against All Defendants and Doe Defendants]

10     54.    Plaintiff hereby incorporates by reference each and every one of the

11  preceding paragraphs as if the same were fully set forth herein.

12     55.    At all times relevant herein, WFHM was acting as a purported agent for

13  U.S. Bank.  U.S. Bank and/or WFHM formed an unconventional relationship with

14  Plaintiff when they chose to take part in a new era of securitization of mortgage loans.

15  U.S. Bank is no longer a bank simply holding the interest in Plaintiff's Note and

16  Mortgage but now is a trustee for a trust which holds the benefit of Plaintiff's Note and

17  Mortgage for the investors in the trust.

18     56.    U.S. Bank and WFHM have a duty to exercise reasonable care[8] and skill to

19  follow California law with regard to enforcement of monetary obligations, and to refrain

20  from taking or failing to take any action against Plaintiff that they did not have the legal

21  authority to do.  This includes enforcing the Note and Deed of Trust by collecting or

22  demanding mortgage payments when they do not have the right to enforce the

23  obligation, causing the Plaintiff to overpay in interest, making derogatory credit reports

---

[8] Normally lenders and servicers do not owe a borrower a duty of care. *Nymark v. Heart Fed. Savings & Loan Assn.*, 231 Cal. App. 3d 1089, 1093 (1991).  However, a bank may be liable in negligence if it fails to discharge its contractual duties with reasonable care. *Das v. Bank of Am.*, 186 Cal. App. 4th 727, 741 (2010).  Additionally, a bank may be liable for aiding and abetting a tort when it renders "substantial assistance" to a tortfeasor during a business transaction that it knowingly aided in the commission of the tort. *Id.* citing *Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1144-45).

1   to credit bureaus, and failing to keep an accurate accounting of Plaintiff's mortgage

2   payments, credits, and debits (if WFHM is in fact the legally authorized mortgage

3   servicer for Plaintiff).

4        57.    U.S. Bank and WFHM have a duty to exercise reasonable care and skill to

5   refrain from taking any action against Plaintiff that they do not have the legal authority

6   to do.  As a direct and proximate result of the reckless negligence, utter carelessness,

7   and blatant fraud of the Defendants as set forth above, the chain of title to Plaintiff's

8   Property has been rendered unmarketable and fatally defective and has caused Plaintiff

9   to lose saleable title to the subject property.

10        58.    U.S. Bank and/or WFHM breached that duty when they failed to follow the

11   guidelines established in the PSA requiring the transfer of the Note and Deed of Trust

12   into the Citigroup Trust by the Closing Date.

13        59.    As a direct and proximate result of the negligence and carelessness of the

14   Defendants as set forth above, Plaintiff suffered, and continues to suffer, general and

15   special damages in an amount to be determined at trial, including attorneys' fees and

16   costs of bringing suit to dispute, validate, and challenge said Defendants' purported

17   rights to enforce her debt obligation against her.

18              **THIRD CAUSE OF ACTION – QUASI CONTRACT**

19                 **[Against All Defendants and Doe Defendants]**

20        60.    Plaintiff hereby incorporates by reference each and every one of the

21   preceding paragraphs as if the same were fully set forth herein.

22        61.    U.S. Bank attempted but failed to become a party to the Note and Deed of

23   Trust when it was purportedly assigned Wells Fargo's interest in Plaintiff's Note and

24   Deed of Trust.  U.S. Bank and/or WFHM demanded monthly mortgage payments from

25   Plaintiff starting in June 26, 2006.  Plaintiff reasonably relied upon U.S. Bank and/or

26   WFHM's assertion that they were entitled to payments.

27        62.    U.S. Bank and/or WFHM knowingly accepted payments and retained them

28   for their own use knowing that U.S. Bank and/or WFHM did not acquire an interest in

FIRST AMENDED COMPLAINT

Plaintiff's Note, such that they could accept or keep Plaintiff's payments. It would be inequitable for U.S. Bank and/or WFHM to retain the payments it received from Plaintiff which they did not have legal authority to collect. The equitable remedy of restitution when unjust enrichment has occurred is an obligation created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money.

63.    Section 23 of the Deed of Trust states that: "Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it."

64.    U.S. Bank and/or WFHM have been unjustly enriched by collecting monthly payments from Plaintiff when they have no interest her Note or Deed of Trust.

65.    Plaintiff seeks restitution for any payments they made to U.S. Bank and WFHM that were not paid to the lender or beneficiary, if any.

## FOURTH CAUSE OF ACTION – VIOLATION OF 15 U.S.C. § 1692e

### [Against U.S. Bank and Doe Defendants]

66.    Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

67.    Defendant U.S. Bank is a debt collector pursuant to the Federal Debt Collection Practices Act ("FDCPA").

68.    Federal law prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt... including the false representation of... the character, amount, or legal status of any debt... and the threat to take any action that cannot legally be taken..." 12 U.S.C. §1692e(2)(A)-(B).

69.    Defendants attempted to collect on the Note under false pretenses, namely that U.S. Bank was assigned Plaintiff's debt when in fact they were not.

70.     WFHM, acting as Plaintiff's mortgage servicer, has been acting in a manner to mislead Ms. Wise into believing that WFHM have the authority to demand payments from her.

71.     WFHM, acting as Plaintiff's mortgage servicer, threatened to take action, namely engaging in collection activities that cannot legally be taken by them.

72.     As alleged herein, Plaintiff's Note was not properly transferred to U.S. Bank, who seeks to cause their purported authorized agent(s) to collect mortgage payments and engage in other unlawful collection practices.

73.     On information and belief, U.S. Bank does not have a perfected security interest in Plaintiff's Note such that they can enforce Plaintiff's obligation and/or collect mortgage payments.

74.     Plaintiff alleges that U.S. Bank falsely represented the status of Plaintiff's debt and Defendants' ability to enforce Plaintiff's debt obligation, in which they have no pecuniary, equitable, or legal interest.

75.     The conduct described above by U.S. Bank, was malicious because Defendants knew that they were not acting on behalf of the current pecuniary beneficiary of the Note and Mortgage.  However, despite such knowledge, Defendants continued to demand and collect Plaintiff's mortgage payments.

76.     On information and belief, U.S. Bank engaged and is engaging in a pattern and practice of defrauding Plaintiff, in that during the entire life of the mortgage Loan, U.S. Bank failed to properly credit payments made, incorrectly calculated interest on the account, and failed to accurately debit fees.

77.     On information and belief, at all times material, U.S. Bank had, and has, actual knowledge that Plaintiff's account was not accurate, but that Plaintiff would continue to make further payments based on Defendants' inaccurate account.  Plaintiff made payments based on these improper, inaccurate, and fraudulent representations.

78.     The foregoing acts and omissions of each and every Defendant and their agents constitute numerous and multiple violations of the FDCPA including, but not

1   limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C.

2   § 1692 et seq., with respect to Plaintiff.

3        79.   Plaintiff could not have reasonably known of the existence of a claim for

4   violation of 15 U.S.C. § 1692e because Defendants fraudulently concealed the fact that

5   they were not entitled to enforce Plaintiff's debt obligation and that they were falsely

6   representing to Plaintiff that the character and amount of money Plaintiff still owed on

7   her debt.[9]

8        80.   As a result of each and every Defendant's violations of the FDCPA,

9   Plaintiff is entitled to actual damages pursuant to 15 U.S.C. § 1692k(a)(1); statutory

10  damages in an amount up to $1,000 pursuant to 15 U.S.C. § 1692k(a)(2)(A); reasonable

11  attorneys' fees and costs pursuant to 15 U.S.C. § 1692k(a)(3); and (4) declaratory relief,

12  from each and every Defendant herein.

13       81.   Plaintiff relied on U.S. Bank's misrepresentations and has been damaged in

14  the following ways: (1) multiple parties may seek to enforce her debt obligation against

15  her; (2) the title to her home has been clouded and its salability has been rendered

16  unmarketable, as any buyer of Plaintiff's home will find themselves in legal limbo,

17  unable to know whether they can safely buy Plaintiff's home or get title insurance; (3)

18  she has been paying the wrong party for an undetermined amount of time and overpaid

19  in interest that was over-calculated; (4) she is unable to determine whether she sent her

20  monthly mortgage payments to the right party; (5) her credit and credit score have been

21  damaged; and (6) she has expended significant funds to cover the cost of attorneys' fees

22  and related costs.

23

24

---

[9] "If a reasonable plaintiff would not have known of the existence of a possible claim within the
25  limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit
    until the plaintiff can gather what information she needs." *Garcia v. Wachovia Mortg. Corp.*, 676
26  F.Supp.2d 895, 905 (2009) citing *Santa Maria*, 202 F.3d at 1178; see also *Stoll v. Runyon*, 165 F.3d
    1238, 1242 (9th Cir.1999) ("Equitable tolling applies when the plaintiff is prevented from asserting a
27  claim by wrongful conduct on the part of the defendant, or when extraordinary circumstances beyond
    the Plaintiff's control made it impossible to file a claim on time.") (citation omitted).
28

## FIFTH CAUSE OF ACTION-VIOLATION OF 15 U.S.C. §1641(g)

### [Against U.S. Bank and Doe Defendants]

82.   Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

83.   Plaintiff resides in the Subject Property and it is her principal residence.

84.   The new subsection (g) added to § 131 of TILA by section 404 of **The Helping Families Save Their Homes Act of 2009** states:

NOTICE OF NEW CREDITOR-
(1)   IN GENERAL. – In addition to other disclosures required by this title, not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer, including-
(A) the identity, address, telephone number of the new creditor
(B) the date of transfer;
(C) how to reach an agent or party having authority to act on behalf of the new creditor;
(D) the location of the place where transfer of ownership of the debt is recorded; and
(E) any other relevant information regarding the new creditor.

85.   Plaintiff alleges that U.S. Bank allegedly and purportedly acquired ownership of her Note after May 2009.  Plaintiff explicitly disputes this allegation.

86.   "The Helping Families Save Their Home Act of 2009," was expressly created by the legislature to avoid the secretive and purported "assignment" that took place here.  The congressional intent of the Act is clear – it was enacted to assist borrowers in identifying who their purported lender is, so that they could contact them if they needed assistance saving their home.   Here, Plaintiff did not get that opportunity since she was not notified as required under TILA.

87.   Section 1641(g) was specifically enacted to protect homeowner's in the position Plaintiff now finds herself.

88.   U.S. Bank, as trustee, is purporting to be Plaintiff's new creditor, as they are acting through their agent WFHM to enforce Plaintiff's Note and Deed of Trust and can, therefore be found to have violated 15 U.S.C. § 1641(g).

FIRST AMENDED COMPLAINT

89.     Here, Plaintiff alleges that U.S. Bank, as Trustee, as the beneficial party and creditor seeking to enforce this debt obligation, does not have any ownership claim in the subject mortgage and is not entitled to collect payment, declare a default, or foreclose on Plaintiff's home.

90.     The Assignment was executed and purportedly transferred an interest in Plaintiff's Note and Deed of Trust to Defendant U.S. Bank.  As the purported assignee of Plaintiff's debt, Defendant U.S. Bank is liable under TILA's notification guidelines. Although Plaintiff disputes the validity of U.S. Bank's claim, for the reasons stated herein, U.S. Bank was still required to follow the provisions of TILA as the purported new creditor.

91.     Defendants purport to be a **creditor** under an alleged "assignment" and is alleged to have violated 15 U.S.C. § 1641(g).

92.     Plaintiff alleges that § 131(g) of TILA applies to U.S. Bank, as the purported and alleged **assignee** of Plaintiff's Loan.  As the purported assignee of the Note, U.S. Bank would also be the creditor as they would "***stand in the shoes of the assignor***," i.e. the originating lender who was also the creditor.[10]

93.     Section 131(g) of TILA requires U.S. Bank, as assignee and creditor, to perform and comply with the requirements of the statute or otherwise face statutory and civil penalties and damages.

94.     U.S. Bank did not provide Plaintiff with written notice within 30 days after the date on which they were allegedly assigned the mortgage.

95.     Ms. Wise never received any notice indicating the exact date of the purported assignment of the interest in her Note, as required by § 131(g)(1)(B).

96.     Ms. Wise never received any notice indicating how to reach an agent or party having authority to act on U.S. Bank's behalf, as required by § 131(g)(1)(C).

---

[10] An assignment operates to transfer to the assignee *all of the rights, title, or interest* of the assignor in the thing assigned. A transfer of all rights, title, and interests *conveys everything* that the assignor owned in the thing assigned and the assignee *stands in the shoes* of the assignor. *Knott v. McDonald's Corp.*, 985 F. Supp. 1222 (N.D. Cal. 1997).

97.    Ms. Wise never received any notice indicating the location of the place where transfer of ownership of the debt is recorded, as required by § 131(g)(1)(D).

98.    Ms. Wise never received any notice indicating any other relevant information regarding the new creditor, purportedly U.S. Bank, as required by § 131(g)(1)(E).

99.    Plaintiff could not have reasonably known of the existence of a TILA violation because Defendants fraudulently concealed the fact that they were purportedly assigned the interest in Plaintiff's Note and Deed of Trust from Wells Fargo.  Even though WFHM is acting as the servicer of her Note and Deed of Trust, Plaintiff was not given notice that her creditor had changed to U.S. Bank.

100.    The statute is clear: "Failure to comply with the requirements of this new subsection 131(g) of TILA may result in civil liability for *actual damages, legal fees and statutory damages* under Section 130(a) of TILA."  In order to maintain a TILA cause of action Plaintiff must allege actual damages **and/or** legal fees **and/or** statutory damages.[11]

101.    U.S. Bank violated 15 U.S.C. § 1641 and are subject to statutory damages, civil liability, penalties, attorneys' fees, and actual damages.  *See* 15 U.S.C. § 1640.

102.    Plaintiff relied on U.S. Bank's misrepresentations and as a result has been damaged in the following ways: (1) multiple parties may seek to enforce her debt obligation against her; (2) the title to her home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiff's home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiff's home or get title

---

[11] *See also, Pacific Shore Funding v. Lozo*, 138 Cal.App.4th 1342, 1350-1351 (2006) (remedies available for violation of 15 U.S.C. § 1640 include damages plus costs of attorney's fees); *King v. Central Bank*, 18 Cal.3d 840, 848 (1997) (reversing trial court's order sustaining demurrer and finding lender liable under 15 U.S.C. § 1640 for "statutory penalties and attorney's fees"); *Chasnik v. BAC Home Loans Servicing LP, et al.* No. CV 11-01324 DMG/JCGx (C.D. Cal, July 20, 2011) (denying motion to dismiss claim for violation of 15 U.S.C. § 1641(g) and finding that "TILA also provides for statutory damages…in an amount not less than $400 or greater than $4,000. 15 U.S.C. § 1640(a)(2)(A)(iv).

FIRST AMENDED COMPLAINT

1   insurance; (3) she has been paying the wrong party for an undetermined amount of time

2   and overpaid in interest that was over-calculated; (4) she is unable to determine whether

3   she sent her monthly mortgage payments to the right party; (5) her credit and credit

4   score have been damaged; and (6) she has expended significant funds to cover the cost

5   of attorneys' fees and related costs.

6       103.   The actual pecuniary damages were proximately caused by U.S. Bank's

7   violation of 15 U.S.C. § 1641 and include, but are not limited to, the over-calculation

8   and overpayment of interest on Plaintiff's Loan, the costs of repairing Plaintiff's credit,

9   the reduction and/or elimination of Plaintiff's credit limits, costs associated with

10  removing the cloud on her property title, and attorneys' fees and costs, in an amount to

11  be proven at trial.

12      104.   Plaintiff is entitled to a private right of action to enforce 15 U.S.C. § 1641,

13  et seq.

14  ## SIXTH CAUSE OF ACTION – VIOLATION OF 12 U.S.C. § 2605 (RESPA)

15  ### [As Against WFHM and Doe Defendants]

16      105.   Plaintiff hereby incorporates by reference each and every one of the

17  preceding paragraphs as if the same were fully set forth herein.

18      106.   Plaintiff's Loan is a federally regulated mortgage loan and is subject to the

19  federal Real Estate Settlement Procedures Act and its implementing regulation,

20  Regulation X.

21      107.   On or about August 21, 2011, Plaintiff sent a Qualified Written Request

22  ("QWR") to WFHM, via U.S. Post Certified Mail.  *See* **Exhibit "G."**

23      108.   12 U.S.C. § 2605(e)(1)(B) defines a "Qualified written request" as:

24

25  [A] written correspondence, other than notice on a payment coupon or
    other payment medium supplied by the servicer, that –

26          (i) includes, or otherwise enables the servicer to identify, the name
    and account of the borrower; and

27          (ii) includes a statement of the reasons for the belief of the

28  borrower, to the extent applicable, that the account is in error or provides

sufficient detail to the servicer regarding other information sought by the borrower.

109.   Plaintiff's QWR contained information to enable WFHM to identify the name and account of the borrower including the loan number, client name, and property address.  Further, in Plaintiff's QWR, Plaintiff expressed her need for understanding and clarification surrounding various circumstances surrounding her loan.  Plaintiff indicated she believed her account was in error due to deceptive and fraudulent servicing practices and specifically requested the following information: a complete life of loan transactional history; the transaction cods for the software platform of the Servicer; the Code definitions; the Key Loan Transaction history; MERS Milestone Report; contact information for holder in due course; copies of collection notes; itemized statement of amount needed to fully reinstate loan; non-attorney communications; and P-309 screen shots of all system accounts.

110.   WFHM did not acknowledge the receipt of Plaintiff's QWR within 5 day of receipt, as required by section 1463(c) of the Dodd-Frank Act and has yet to respond at all.

111.   Because the Loan is subject to RESPA, the Dodd-Frank Act, and Regulation X, all Defendants were required to comply with section 1463 of the Dodd-Frank Act.

112.   WFHM violated Section 6 of Regulation X upon receipt of Plaintiff's QWR by their actions including, but not limited to: (a) failure to make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmitting to the borrower a written notification of the correction; and (b) failure to protect Plaintiff's credit rating upon receipt of Plaintiff's QWR by furnishing adverse information regarding payment to credit reporting agencies as defined in section 603 of the Fair Credit Reporting Act, 15 U.S.C. § 1681(a).

113.   WFHM violated 12 U.S.C. § 2605 and is subject to statutory damages, civil liability, penalties, attorneys' fees, and actual damages. *See* 12 U.S.C. § 2605.

114.   The actual pecuniary damages include, but are not limited to, the over calculation and overpayment of interest on Plaintiff's Loan, the costs of repairing Plaintiff's credit, the reduction and/or elimination of Plaintiff's credit limits, costs associated with removing the cloud on her Property title and setting aside the trustee's sale, and attorneys' fees and costs, in an amount to be proven at trial.

115.   As a direct and proximate result of the violations of RESPA, Dodd-Frank Act, and Regulation X by WFHM, Plaintiff has suffered actual pecuniary damages, including but not limited to statutory damages, civil liability, and attorneys' fees, in an amount to be proven at trial.

116.   As a result of WFHM's violations of 12 U.S.C. § 2605, RESPA, the Dodd-Frank Act, and Regulation X, Plaintiff has been damaged in the following ways: (1) multiple parties may seek to enforce her debt obligation against her; (2) the title to her home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiff's home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiff's home or get title insurance; (3) she has been paying the wrong party for an undetermined amount of time and overpaid in interest that was over-calculated; (4) she is unable to determine whether she sent her monthly mortgage payments to the right party; (5) her credit and credit score have been damaged; and (6) she has expended significant funds to cover the cost of attorneys' fees and related costs.

## SEVENTH CAUSE OF ACTION –
## VIOLATION OF BUS. AND PROF. CODE SECTION 17200, ET SEQ.
### [Against All Defendants and Doe Defendants]

117.   Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

118.   Defendants have engaged in unfair, unlawful, and fraudulent business practices in the State of California, as set forth above.

FIRST AMENDED COMPLAINT

-25-

119.   By engaging in the above-described acts and practices, Defendants have committed one or more acts of unfair competition within the meaning of Bus. and Prof. Code section 17200, et seq.

120.   Cal. Bus. and Prof. Code section 17200, et seq., prohibits acts of unfair competition, which means and includes any unlawful, unfair or fraudulent business act and conduct that is likely to deceive and is fraudulent in nature.

121.   Defendant U.S. Bank, acting as the trustee of the Harborview Trust, has violated 15 U.S.C. § 1692e, by attempting to collect Plaintiff's debt obligation under false, deceptive, and misleading representation.

122.   Defendant WFHM, acting as the mortgage servicer of Plaintiff's Note and Mortgage have violated 15 U.S.C. § 1692e, by attempting to collect Plaintiff's debt obligation on behalf of U.S. Bank under false, deceptive, and misleading representation.

123.   Defendants WFHM violated 12 U.S.C. § 2605 by failing to acknowledge the receipt of Plaintiff's QWR within 5 days of receipt, and by failing to provide a substantive response within 30 days of receipt, as required by section 1463(c) of the Dodd-Frank Act.

124.   Defendants U.S. Bank and/or WFHM violated Cal. Penal Code section 532(f)(a)(4) by filing or causing the Assignment to be filed with the recorder of the Los Angeles county in connection with Plaintiff's mortgage loan transaction with knowledge that the Assignment contained a deliberate misstatement and misrepresentation that U.S. Bank had been assigned Plaintiff's Note and Mortgage.

125.   Defendants U.S. Bank and/or WFHM engaged in unfair, unlawful,[12] and fraudulent business practices with respect to mortgage loan servicing and related matters.

---

[12] "Unlawful" acts or practices are those forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, or court-made. *Saunders v. Superior Court*, 27 Cal. 4th 832 (1994); *Hewlett v. Squaw Valley*, 54 Cal. 4th 499 (1997).

126.   Defendants U.S. Bank and/or WFHM demanded and accepted payments for debts that were non-existent.

127.   Defendants U.S. Bank and/or WFHM reported payments as late to credit bureaus without the legal right or authority to do so.

128.   Defendants U.S. Bank acted as a beneficiary without the legal authority to do so.

129.   Defendants U.S. Bank and/or WFHM facilitated, aided, and abetted the illegal, deceptive, and unlawful enforcement of Plaintiff's Note and Mortgage and engaged in other illegal debt collection activities.

130.   WFHM, acting as Plaintiff's mortgage servicer, has been acting in a manner to mislead Mr. Baron into believing that U.S. Bank and/or WFHM had the authority to demand payments from him.

131.   As alleged herein, Plaintiff's Note was not properly transferred to U.S. Bank, who seek to cause their purported authorized agent(s) to collect mortgage payments and engage in other unlawful collection practices.

132.   On information and belief, U.S. Bank does not have a perfected security interest in Plaintiff's Note such that they can enforce Plaintiff's obligation and/or collect mortgage payments.

133.   Plaintiff alleges, on information and belief, U.S. Bank fraudulently enforced a debt obligation in which they had no pecuniary, equitable, or legal interest. U.S. Bank's conduct is part of a fraudulent debt collection scheme.

134.   The conduct described above by U.S. Bank and/or WFHM, was malicious because Defendants knew that they were not acting on behalf of the current pecuniary beneficiary of the Note and Mortgage. However, despite such knowledge, Defendants continued to demand and collect Plaintiff's mortgage payments.

135.   On information and belief, at all times material, U.S. Bank and/or WFHM had, and have, actual knowledge that Plaintiff's account was not accurate, but that Plaintiff would continue to make further payments based on Defendants' inaccurate

account.  Plaintiff made payments based on these improper, inaccurate, and fraudulent representations.

136.   As more fully described above, Defendants U.S. Bank's and/or WFHM's acts and practices are unlawful.  This conduct is ongoing and continues to this date.

137.   As more fully described above, Defendants U.S. Bank's and/or WFHM's acts and practices are likely to deceive members of the public.  This conduct is ongoing and continues to this date.

138.   As more fully described above, Defendants U.S. Bank's and/or WFHM's acts and practices are unfair and the harm caused by their conduct outweighs any benefit that their conduct may have.  This conduct is ongoing and continues to this date.

139.   Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein, Defendants violated several laws including Cal. Bus. and Prof. Code section 17200, et seq. and must be required to disgorge all profits related to their unfair, unlawful, and deceptive business practices.

140.   Plaintiff alleges that Defendants U.S. Bank's and/or WFHM's misconduct, as alleged herein, gave them an unfair competitive advantage over their competitors. The scheme implemented by Defendants U.S. Bank and/or WFHM is designed to defraud California consumers and enrich the U.S. Bank and/or WFHM.

141.   The foregoing acts and practices have caused substantial harm to California consumers, including Plaintiff.

142.   By reason of the foregoing, U.S. Bank and/or WFHM have been unjustly enriched, by collecting payments that they are not entitled to, and should be required to make restitution to Plaintiff and other California consumers who have been harmed, and/or be enjoined from continuing in such practices pursuant to Cal. Bus. and Prof. Code sections 17203 and 17204.

143.   As a direct and proximate result of the actions of U.S. Bank and/or WFHM, and each of them, stated above, Plaintiff has been injured in that a cloud has been placed

1   upon title to Plaintiff's Property and U.S. Bank and/or WFHM have failed to remove

2   this cloud from Plaintiff's title.

3       144.   Plaintiff requests the Court to issue an order compelling U.S. Bank and/or

4   WFHM, and any other Defendants claiming an interest in and to the Property to take any

5   and all actions necessary to remove the cloud they have placed upon his title and an

6   order enjoining such Defendants from taking such actions again in the future.

7       145.   As a direct and proximate result of the violations of Cal. Bus. and Prof.

8   Code section 17200 by U.S. Bank and/or WFHM, Plaintiff has suffered actual pecuniary

9   damages, including, but not limited to civil liability, restitution, injunctive relief

10   preventing U.S. Bank and/or WFHM from continuing to collect mortgage payments, and

11   attorneys' fees, in an amount to be proven at trial.

12       146.   As a result of U.S. Bank's and WFHM's violations of Cal. Bus. and Prof.

13   Code section 17200, Plaintiff has been damaged in the following ways: (1) multiple

14   parties may seek to enforce her debt obligation against her; (2) the title to her home has

15   been clouded and its salability has been rendered unmarketable, as any buyer of

16   Plaintiff's home will find themselves in legal limbo, unable to know whether they can

17   safely buy Plaintiff's home or get title insurance; (3) she has been paying the wrong

18   party for an undetermined amount of time and overpaid in interest that was

19   overcalculated; (4) she is unable to determine whether she sent her monthly mortgage

20   payments to the right party; (5) her credit and credit score have been damaged; and (6)

21   she has expended significant funds to cover the cost of attorneys' fees and related costs.

22   ## EIGHTH CAUSE OF ACTION - ACCOUNTING

23   ### [Against U.S. Bank, WFHM, and Doe Defendants]

24       147.   Plaintiff hereby incorporates by reference each and every one of the

25   preceding paragraphs as if the same were fully set forth herein.

26       148.   U.S. Bank, and WFHM as its purported agent, have held themselves out to

27   be Plaintiff's creditor and mortgage servicer.  As a result of this purported relationship

28

with Plaintiff, said Defendants have a fiduciary duty to Plaintiff to properly account for payments made by Plaintiff. [13]

149.   As a result of the aforementioned fraudulent conduct, Plaintiff paid U.S. Bank and WFHM her mortgage payments for a period of approximately five years. However, for the reasons stated herein, none of this money was actually owed to U.S. Bank or WFHM.  For that reason, these monies are due to be either credited back to Plaintiff in full or credited to the rightful owner of Plaintiff's Note and Mortgage.

150.   The amount of the money due from Defendants to Plaintiff is unknown to Plaintiff and cannot be ascertained without an accounting of the receipts and disbursements of the aforementioned transactions.  Plaintiff is informed and believes and thereon alleges that the amount due to him exceeds $75,000.00.

## NINTH CAUSE OF ACTION – BREACH OF CONTRACT

### [Against U.S. Bank, WFHM and Doe Defendants]

151.   Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

152.   In the alternative, if the Court finds that U.S. Bank is a successor in interest to the Deed of Trust pursuant to the terms of the Deed of Trust, Plaintiff alleges that Defendants U.S. Bank and/or WFHM breached the Deed of Trust by improperly crediting and debiting her account.

153.   On June 26, 2006, Plaintiff obtained the Loan from Wells Fargo and executed a Note and Deed of Trust.

154.   U.S. Bank allegedly became a party to this contract when it was purportedly assigned Wells Fargo's interest in Plaintiff's Note and Deed of Trust.

---

[13] To state a cause of action for accounting, a plaintiff must allege the existence of a fiduciary relationship, or accounts so complicated that an ordinary legal action demanding a fixed sum is impracticable. 5 Witkin, Cal. Proc. 4th (1997) Pleading, section 775, p. 233. The elements for a claim for accounting are:  (1) fiduciary relationship or other circumstances appropriate to the remedy; and (2) a balance due from the defendant to the plaintiff that can only be ascertained by an accounting. *See* Witkin, California Procedure, Pleadings, section 776, p. 233 (4th ed.).

FIRST AMENDED COMPLAINT                                                                                    -30-

155.   The Deed of Trust sets forth the dates that the monthly principal and interest payments were due and when late fees and other charges could be assessed.

156.   Section 2 of the Deed of Trust states that: "Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due."   *See* **Exhibit "H,"** attached hereto, a true and correct copy of the Deed of Trust.

157.   Plaintiff substantially performed all of her conditions in the Deed of Trust, including timely paying her mortgage to Defendants.

158.   Defendants WFHM, and/or U.S. Bank breached the Deed of Trust by failing to apply the payments made by Plaintiff in the order of priority set forth in Section 2, and this resulted in improper fees and taxes being added to the balance of the Loan.

159.   Plaintiff was unaware that Defendants were failing to apply the payments in the way set forth in the Deed of Trust because Defendants fraudulently concealed this practice of applying Plaintiff's mortgage payments to Plaintiff's account. Plaintiff could not have reasonably discovered the impropriety of Defendants behavior because these facts were hidden from her and were not disclosed throughout the servicing of her Loan.

160.   Plaintiff could not have reasonably known of the existence of a breach of the Deed of Trust because Defendants fraudulently concealed the improperly applied mortgage payments, the incorrect calculation of interest, and the improper fees added to Plaintiff's account that did not comply with Section 2 of Plaintiff's Deed of Trust.

161.   As a proximate result of Defendants' breaches, Plaintiff has suffered compensatory damages in an amount to be proven at trial. Plaintiff relied on WFHM and/or U.S. Bank's misrepresentations and have been damaged in the following ways: (1) multiple parties may seek to enforce her debt obligation against her; (2) the title to her home has been clouded and its salability has been rendered unmarketable, as any

buyer of Plaintiff's home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiff's home or get title insurance; (3) she has been paying the wrong party for an undetermined amount of time and overpaid in interest that was overcalculated; (4) she is unable to determine whether she  sent her monthly mortgage payments to the right party; (5) her credit and credit score have been damaged; and (6) she has expended significant funds to cover the cost of attorneys' fees and related costs.

## TENTH CAUSE OF ACTION – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### [Against U.S. Bank, WFHM and Doe Defendants]

162.   Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

163.   In the alternative, if the Court finds that U.S. Bank is a successor in interest to the Deed of Trust pursuant to the terms of the Deed of Trust, Plaintiff alleges that Defendants U.S. Bank and WFHM breached the implied promise of good faith and fair dealing by making it impossible for Plaintiff to carry out her obligations under the contract because of the improperly applied payments and addition of interest and improper fees to her account.

164.   In every contract or agreement there is an implied promise of good faith and fair dealing.  Each party agrees to refrain from any action that would render performance of the contract impossible, and to do everything that the contract presupposes that each party will do to accomplish its purpose.[14]  The implied promise of good faith and fair dealing cannot create obligations that are inconsistent with the terms of the contract.[15]

---

[14] *April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 816 (1983); *Harm v. Frasher,* 181 Cal. App. 2d 405, 417 (1960).

[15] "There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 (internal citation omitted). "The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.* The covenant thus cannot " 'be endowed with an existence independent of

FIRST AMENDED COMPLAINT                                                                      -32-

165.   As alleged above, Plaintiff entered into a contract (Deed of Trust) with Wells Fargo and substantially performed the conditions under the Deed of Trust.

166.   U.S. Bank allegedly became a party to this contract when it was purportedly assigned Wells Fargo's interest in Plaintiff's Note and Deed of Trust.

167.   Defendants enjoyed substantial discretionary power affecting the Plaintiff's rights under the Deed of Trust as detailed throughout this Complaint.  Defendants are required to exercise such power in good faith.

168.   Defendants breached their duty of good faith by interfering with Plaintiff's ability to perform her obligations under the contract because Defendants improperly applied mortgage payments, incorrectly calculated interest, and improperly added fees to Plaintiff's account making it impossible for Plaintiff to ever fulfill her obligations. Defendants' failure to cooperate allowed them to collect more money from Plaintiff than they were owed.[16]

169.   Plaintiff could not have reasonably known of the existence of a breach of the implied covenant of good faith and fair dealing claim because Defendants fraudulently concealed the fact that they were not applying payments in accordance with the Deed of Trust thereby interfering with the Plaintiff's ability to perform under the contract.  Defendants concealed the improperly applied mortgage payments, the incorrect calculation of interest, and the improper fees added to Plaintiff's account and continued to render Plaintiff's performance of the contract impossible.

170.   As a proximate result of Defendants' breaches, Plaintiff has suffered general and special damages in an amount to be proven at trial.

171.   Plaintiff relied on WFHM, and/or U.S. Bank's misrepresentations and has been damaged in the following ways: (1) multiple parties may seek to enforce her debt

---

its contractual underpinnings.' " " It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 349-350 (2000) (citations omitted).

[16] Witkin, Summary of California Law, Contracts, §744 (8th ed.); *see also Sutherland v. Barclays American/Mortgage Corp.*, 53 Cal. App. 4th 299, 314 (1997); *Harm v. Frasher*, 181 Cal. App. 2d 405, 415 (1960).

obligation against her; (2) the title to her home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiff's home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiff's home or get title insurance; (3) she has been paying the wrong party for an undetermined amount of time and overpaid in interest that was overcalculated; (4) she is unable to determine whether she sent her monthly mortgage payments to the right party; (5) her credit and credit score have been damaged; and (6) she has expended significant funds to cover the cost of attorneys' fees and related costs.

## TWELFTH CAUSE OF ACTION –
## VIOLATION OF CALIFORNIA CIVIL CODE SECTIONS 2923.5 AND 2924
### [Against U.S. Bank, WFHM, and Doe Defendants]

172.   Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

173.   Plaintiff alleges that all times mentioned herein the Subject Property was his owner-occupied residence and that Plaintiff was a member of the class of persons protected under Civil Code Sections sections 2923.5 and 2924.  Plaintiff alleges further that at all times mentioned here Defendants had a duty to comply with the foreclosure avoidance and workout plan requirements of Civil Code Section section 2923.5. Plaintiff further alleges that Fidelity National Title Insurance Company as the purported foreclosing trustee, was at all times herein an agent to both Plaintiff and the remaining defendants, and that Fidelity National Title Insurance Company had a duty to Plaintiff to ensure that the foreclosure on the Subject Property was conducted fairly and according to prescribed statutory procedures, including those contained in Civil Code sections 2923.5 and 2924.

174.   Plaintiff alleges on information and belief that because U.S. Bank, by not having been assigned the Deed or having recorded the Deed at the time the Notice of Default was issued, was not the lawful Beneficiary, and could not execute the Notice of Default.

175.   Accordingly, Defendants U.S. Bank and WFHM are not entitled to utilize California Civil Code section 2924 et seq. (California's non-judicial foreclosure scheme) to wrongfully convert Plaintiff's Property.

176.   On information and believe, Plaintiff alleges that said Defendants also failed to give proper notice of the Notice of Default and/or Notice of Trustee Sale. Said failures are in direct violation of the notice and recording requirements set forth in California Civil Code section 2923.5. As a result, Plaintiff was not properly informed regarding a pending Notice of Default and/or Notice of Trustee Sale, and consequently could not exercise her rights to investigate the circumstances of the foreclosure proceedings.

177.   Plaintiff further alleges on information and belief, that the Notice of Trustee's Sale is invalid because the Notice of Default and/or Notice of Trustee's Sale did not have the required valid Declaration of Due Diligence and did not [or] failed to have any content in the existing declaration to show by admissible evidence full compliance. Despite Plaintiff's efforts to explore foreclosure avoidance options, Defendants, and each of them, failed and refused to: 1) evaluate Plaintiff's financial condition regarding foreclosure avoidance (2) advise Plaintiff of her statutory right to meet with Defendant regarding such foreclosure avoidance; and 3) advise Plaintiff of the toll-free federal Department of Housing and Urban Development ("HUD") telephone number regarding counseling opportunities to avoid the subject foreclosure. Furthermore, Plaintiff alleges that Defendants reported their filing of the notice of default and foreclosure on the Subject Property to credit reporting agencies, and that such reporting has damaged Plaintiff's credit and severely impaired Plaintiff's ability to obtain consumer credit and home mortgage financing

WHEREFORE, Plaintiff prays as follows:

1.   For compensatory, special, and general damages in an amount according to proof at trial, but not less than $5,000,000, against all Defendants;

2.     For punitive and exemplary damages in an amount to be determined by the Court against all Defendants;

3.     For an order compelling Defendants to remove any instrument, including the Assignment, which does or could be construed as constituting a cloud upon Plaintiff's title to the Property;

4.     For a declaratory judgment finding that Defendants do not have any legally cognizable rights as to Plaintiff, the Property, Plaintiff's Promissory Note, Plaintiff's Deed of Trust, or any other matter based on contract or any of the documents prepared by Defendants, tendered to and executed by Plaintiff;

5.     For the Court to issue an order restraining Defendants, their agents, or employees from continuing or initiating any action against the Property and enjoining Defendants, their agents, or employees from doing so during the pendency of this matter;

6.     For an order compelling Defendants to disgorge all amounts wrongfully taken from Plaintiff and returning the same to Plaintiff's interest thereon at the statutory rate from the date the funds were first received from Plaintiff;

7.     For costs of suit incurred herein;

8.     For reasonable attorneys' fees incurred; and

9.     For such other and further relief as the Court may deem proper.

Dated:     December 5, 2011     PROSPER LAW GROUP, LLP

By:     *Michael Thompson*

Gordon F. Dickson
Deborah P. Gutierrez
Michael E. Thompson
Attorneys for Plaintiff,
Margaret S. Wise

FIRST AMENDED COMPLAINT

-36-

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiff Margaret S. Wise hereby demands a trial by jury on all claims.

3

4     Dated:          December 5, 2011                PROSPER LAW GROUP, LLP

5

6

7                                           By:    _Michael Thompson_____

8                                                  Gordon F. Dickson
                                                   Deborah P. Gutierrez
9                                                  Michael E. Thompson
                                                   Attorneys for Plaintiff,
10                                                 Margaret S. Wise

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

-37-

# EXHIBIT A

## Securitization Structure



# EXHIBIT B



**Standing Investigator – Property of Margaret S. Wise**
By Marie McDonnell

# Standing Investigator™

*Evidentiary Foundation Required to Determine Holder Status*

*Mortgagor*

Margaret S. Wise

2009 Ernest Avenue, Redondo, Los Angeles County, California 90278

---

*Mortgagee*

Wells Fargo Bank, N.A.

---

*Assignee*

Citigroup Mortgage Loan Trust 2006-AR9

*Prepared By*

**MARIE McDONNELL, PRESIDENT**

**McDONNELL PROPERTY ANALYTICS, INC.**

P.O. Box 2067, Orleans, Massachusetts 02653

(v) 508-694-6866   (f) 508-694-6874

Marie@mcdonnellanalytics.com

Standing Investigator- Property of Margaret S. Wise
© 2011 McDonnell Property Analytics, Inc., All Rights Reserved

# Table of Contents

STANDING INVESTIGATOR – PROPERTY OF MARGARET S. WISE ....................................................1

TABLE OF CONTENTS ...................................................................................................3

ABSTRACT..................................................................................................................4
    SUBJECT:...................................................................................................................4
    PURPOSE & USE OF REPORT: ......................................................................................4
    ISSUES:......................................................................................................................4

RESEARCH..................................................................................................................6
    TRANSACTION DETAILS:.............................................................................................6
    LOOKUP REFERENCES:...............................................................................................6
    MERS RESEARCH:.....................................................................................................6
    DOCUMENTS SUPPLIED:.............................................................................................7
    DOCUMENTS REVIEWED:............................................................................................7
    METHODOLOGY:........................................................................................................7

ANALYSIS...................................................................................................................8

TABLE OF EXHIBITS....................................................................................................10
    A.    Adjustable Rate Note, 6/26/2006................................................................10
    B.    Deed of Trust, 6/26/2006...........................................................................10
    C.    Assignment of Deed of Trust, 7/19/2011 ....................................................10
    D.    Notice of Default, 8/5/2011 ........................................................................10
    E.    Bloomberg Research Results .......................................................................10
    F.    Prospectus Supplement Excerpt ..................................................................10

**DISCLAIMER**

*The opinions expressed herein do not constitute legal advice or conclusions of law but are deduced from the facts as these became known to the Examiner through her forensic investigation of the evidence available at this writing. The Examiner reserves the right to alter or amend this report as new evidence becomes available.*

Standing Investigator- Property of Margaret S. Wise
© 2011 McDonnell Property Analytics, Inc., All Rights Reserved

# Abstract

**SUBJECT:**

The subject of this analysis involves a consumer mortgage transaction that took place on June 25, 2006, by and between Margaret S. Wise ("Wise") and Wells Fargo Bank NA ("Wells Fargo"). The borrower executed an Adjustable Rate Note and granted a Deed of Trust in favor of Wells Fargo to obtain funds in the amount of $940,000.00.

The Note and Adjustable Rate Rider to the Deed of Trust indicate that the subject transaction in question began with an interest-only payment obligation based on an initial fixed rate of 6.375% for the first five (5) years. Thereafter, for the remaining twenty-five (25) year period, the interest rate was to be adjusted annually predicated on the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year ("Index") plus 2.75% ("Margin") rounded to the nearest one-eighth of one percentage point (0.125%). The corresponding monthly payments associated with each adjustment will be sufficient to amortize the unpaid principal balance over the remaining term to maturity. (*See* Exhibit A. - Adjustable Rate Note)

To guarantee the debt, the borrowers executed a Deed of Trust secured by residential property located at 2009 Ernest Avenue, Redondo Beach, Los Angeles County, California 90278 ("Property"). (*See* Exhibit B. - Deed of Trust)

On July 19, 2011, Carla Naughton, acting in her capacity as Vice-President of Loan Documentation for Wells Fargo Bank, NA, executed an Assignment of Deed of Trust, which purports to grant, assign and transfer, to US Bank National Association, as Trustee for Citigroup Mortgage Loan Trust Inc., Mortgage Pass-Through Certificates, Series 2006-AR9, all beneficial interest to the Deed of Trust, dated June 26, 2006 together with the note or notes therein described. Said document was recorded in the Official Records of Los Angeles County on August 16, 2011. (*See* Exhibit C. – Assignment of Deed of Trust)

On August 5, 2011, Wendy Randall, as an employee and/or agent, of First American Trustee Servicing Solutions, LLC, issued a Notice of Default and Election to Sell Under Deed of Trust. Said document was recorded in the Official Records of Los Angeles County on August 10, 2011, six (6) days before the above-mentioned Assignment. (*See* Exhibit D. – Notice of Default)

**PURPOSE & USE OF REPORT:**

The purpose of this examination is: 1) to investigate the ownership history of the subject mortgage to the extent possible through various research tools at our disposal; and 2) to report conflicting information in the documentary evidence regarding standing where detected.

**ISSUES:**

(1) Current ownership of the Deed of Trust in question.

(2) Documentary evidence conflicts.

(3) Evidence of missing assignments.

(4) Mortgage Fraud:  Potential violation of the California Penal Code Section 532f.

Standing Investigator- Property of Margaret S. Wise
© 2011 McDonnell Property Analytics, Inc., All Rights Reserved

# Research

**TRANSACTION DETAILS:**

| | |
|---|---|
| Settlement Date: | June 26, 2006 |
| Borrower: | Margaret S. Wise |
| Lender: | Wells Fargo Bank, N.A. |
| Nominee: | N/A |
| Zip Code | 90278 |
| Principal Amount: | $940,000.00 |
| First Payment Date: | August 1, 2006 |
| Maturity Date: | July 01, 2036 |
| Interest Rate: | 6.375% |
| Type of Loan: | 5/25 Interest-Only ARM |
| Riders: | Adjustable Rate Rider; 1-4 Family Rider |

**LOOKUP REFERENCES:**

| | |
|---|---|
| REMIC Trust: | Citigroup Mortgage Loan Trust 2006- AR9 |
| SEC Website: | http://www.secinfo.com/$/SEC/Registrant.asp?CIK=1381295 |
| Trust Agreement: | *See:* PSA |
| Prospectus: 424B5 | http://www.secinfo.com/dqTm6.v3ur.htm |
| PSA: | http://www.secinfo.com/dqTm6.uxn.c.htm |
| Form 8-K: | http://www.secinfo.com/$/SEC/Documents.asp?CIK=1381295&Party=BFO&Type=8-K&Label=Current+Reports+%2D%2D+Form+8%2DK |
| MLPA: | http://www.secinfo.com/dqTm6.uxn.a.htm |
| Loan Schedule: | http://www.secinfo.com/dqTm6.v3Re.htm  (Loan is included.) |
| Governing Law: | State Of New York (*See* Section 11.04 of the PSA) |

**MERS RESEARCH:**

| | |
|---|---|
| MOM: | No |
| MIN Number: | N/A |
| Lender I.D.: | N/A |
| Status: | N/A |

© 2011 McDonnell Property Analytics, Inc., All Rights Reserved

**DOCUMENTS SUPPLIED:**

| INSTRUMENT | RECORDING | DOCUMENT | DESCRIPTION |
|---|---|---|---|
| 06/26/2006 | 06/30/2006 | 06   1447706 | Deed of Trust; Adjustable Rate Rider |
| 07/19/2011 | 08/16/2011 | 20111102742 | Assignment of Deed of Trust |
| 08/05/2011 | 08/10/2011 | 20111073344 | Notice of Default |

**DOCUMENTS REVIEWED:**

— Deed of Trust; Adjustable Rate Rider; Assignment of Deed of Trust and Notice of Default and Election to Sell Under Deed of Trust, as recorded in the Official Records of Los Angeles County;

— Researched Mortgage Electronic Registration Systems, Inc. website for all relevant information;

— Researched  Bloomberg Database;

— Researched SEC registration filings with respect to Citigroup Mortgage Loan Trust 2006-AR9.

**METHODOLOGY:**

Our methodology for tracing the transfers and assignments of residential mortgages involves a systematic approach to examining the relevant documents provided to us by the client in combination with researching both public and private databases that contain past and present traces of the whereabouts of the mortgage in question including: Fannie Mae's Loan Lookup; Freddie Mac's Self-Service Loan Lookup; Mortgage Electronic Registration Systems, Inc.'s website; and Bloomberg Professional which is a robust mortgage-backed securities database utilized by institutional investors; the Securities and Exchange Commission's public access websites; and documents recorded in the public land records.

Standing Investigator- Property of Margaret S. Wise
© 2011 McDonnell Property Analytics, Inc., All Rights Reserved

# Analysis

My examination of the evidence available as of this writing revealed the following facts:

- The Loan in question is being tracked as a receivable of the Citigroup Mortgage Loan Trust 2006- AR9 ("REMIC Trust").  (*See* Exhibit E. – Bloomberg Research Results)

- The Citigroup Mortgage Loan Trust 2006- AR9 is a public offering and the related documents are available on the Securities and Exchange Commission's public access website at: http://www.secinfo.com/$/SEC/Registrant.asp?CIK=1381295.

- The Prospectus Supplement contains a Summary of the securitization and lists the entities that were involved which may be viewed in its entirety at: http://www.secinfo.com/dqTm6.v3ur.htm.

- The Pooling and Servicing Agreement ("PSA") that governs the securitization describes how the Mortgage Loans are to be conveyed into the REMIC Trust.  The PSA may also be viewed in its entirety at: http://www.secinfo.com/dqTm6.uxn.c.htm.

- The Mortgage Loan Schedule was contained in the Free Writing Prospectus filed on November 16, 2006 and may be viewed on the SEC's website at: http://www.secinfo.com/dqTm6.v3Re.htm.

- I was able to confirm that the subject loan is included in the Mortgage Loan Schedule and is identified as msvln 30095555, and loanid number 221554572.

- According to Section 2.01 of the PSA, all loans to be included in the REMIC Trust are to be transferred to it by a Special Purchase Entity known as the *Depositor* who in this case was Citigroup Mortgage Loan Trust, Inc.

- Thus, there should be an assignment of the Deed of Trust from Citigroup Mortgage Loan Trust Inc. to U.S. Bank National Association, Trustee of the Citigroup Mortgage Loan Trust 2006- AR9. However, no such assignment is in evidence. (*See* Exhibit F. – PSA Excerpt)

- In addition, there should be a series of antecedent assignments that move the subject Deed of Trust from the *Originator* (Wells Fargo Bank, NA) to the *Seller/Sponsor* (Citigroup Global Markets Realty Corp.) of the securitization; and from the *Seller /Sponsor* to the *Depositor* (Citigroup Mortgage Loan Trust, Inc.). Again, no such assignments are in evidence.

- Accordingly, the Assignment of Deed of Trust executed by Carla Naughton purporting to grant, assign and transfer the subject Note and Security Instrument from Wells Fargo Bank, NA to U.S. Bank National Association, as Trustee for Citigroup, Mortgage Loan and Trust Inc., Mortgage Pass through Certificates, Series 2006-AR9 is ineffective and without authority to transfer the subject security instrument because it violates Section

Standing Investigator- Property of Margaret S. Wise
© 2011 McDonnell Property Analytics, Inc., All Rights Reserved

2.01 of the PSA in that only the *Depositor*, Citigroup Mortgage Loan Trust Inc., could effectuate the transfer. (See Exhibit C. – Assignment of Trust, 07/19/11)

- On information and belief, the above referenced assignment as recorded in the Official Records of Los Angeles County ( 08/16/11), contains false statements and omissions of material facts, i.e., the allegation that the *Originator* transferred the Deed of Trust directly into U.S. Bank National Association, as Trustee for Citigroup Mortgage Loan Trust 2006-AR9 is patently untrue; further it is non-compliant with the representations and warranties made to Investors in the Prospectus Supplement and the Pooling and Servicing Agreement registered with the SEC.

- In conclusion, based on (1) my having confirmed that the Loan in question is being tracked as a receivable of the Citigroup Mortgage Loan Trust 2006-AR9; and (2) my experience and specialized knowledge with respect to well-documented, systemic failures in the securitization process, it is my opinion, subject to further discovery and a complete forensic examination of this transaction, that:

  ☑ The chain of title to the Property is impaired due to the failure to record all intervening assignments that would close the gap between the originating Lender, Wells Fargo Bank, N.A. and the Citigroup Mortgage Loan Trust 2006-AR9.

Respectfully submitted,

*Marie Mc Donnell*

Marie McDonnell, President
*Mortgage Fraud and Forensic Analyst*
*Certified Fraud Examiner, ACFE*

© 2011 McDonnell Property Analytics, Inc., All Rights Reserved

# Table of Exhibits

A.      Adjustable Rate Note, 6/26/2006

B.      Deed of Trust, 6/26/2006

C.      Assignment of Deed of Trust, 7/19/2011

D.      Notice of Default, 8/5/2011

E.      Bloomberg Research Results

F.      Prospectus Supplement Excerpt

Standing Investigator- Property of Margaret S. Wise
© 2011 McDonnell Property Analytics, Inc., All Rights Reserved

# EXHIBIT "A"

# ADJUSTABLE RATE NOTE

(1-Year Treasury Index-Rate Caps)
(Assumable after Initial Period)                                                    0153483615

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

JUNE 26, 2006                          REDONDO BEACH                    CALIFORNIA
_____                          _____                    _____
    Date                                   City                            State

2009 ERNEST AVENUE, REDONDO BEACH, CA  90278
_____
                          (Property Address)

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   940,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is _____
WELLS FARGO BANK, N.A.
_____

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   6.375%.

The interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS
### (A) Time and Place of Payments

I will make a payment every month on the first day of each month beginning on AUGUST 1, 2006 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and if the payment consists of both principal and interest, it will be applied to interest before Principal. If, on JULY 1, 2036     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at WELLS FARGO BANK, N.A.
P.O. BOX 17339, BALTIMORE, MD  21297-1339
_____
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Before the first fully amortizing principal and interest payment due date stated in subsection (C) below (the "First P&I Payment Due Date"), my monthly payments will be only for the interest due on the unpaid principal of this Note.

Each of my initial monthly payments will be in the amount of U.S. $   4,993.75 . This amount may change in accordance with subsection (C) below.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate I must pay. The First P&I Payment Due Date is AUGUST 1, 2011 .

Prior to the First P&I Payment Due Date, my monthly payment may change to reflect changes in the interest rate I must pay in accordance with Section 4 of this Note or changes in the unpaid principal of my loan in accordance with Section 5 of this Note. Before the effective date of any change in my monthly payment, the Note Holder will deliver or mail to me a notice of the change in accordance with Section 8 of this Note. The notice will include the title and telephone number of a person who will answer any question I may have regarding the notice.

Beginning with the First P&I Payment Due Date, my monthly payment will change to an amount sufficient to repay the principal and interest at the rate described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Sections 4 and 5 of this Note.

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates

The interest rate I will pay may change on the first day of JULY, 2011 ,
and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date".

ADJUSTABLE RATE NOTE-1-Year Treasury Index

**(B) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

## (C) Calculation of Changes

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage point(s) ( 2.750%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be the new interest rate until the next Interest Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Interest Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

## (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Interest Change Date will not be greater than 11.375% or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Interest Change Date by more than two percentage point(s) ( 2.000%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.375 %.

## (E) Effective Date of Changes

My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again.

## (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge.  The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note.  If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to the changes.

If I make a partial Prepayment during the period ending with the due date of my last interest only monthly payment, my partial Prepayment will reduce the amount of my monthly payment. If I make a partial Prepayment after the last interest only monthly payment, my partial Prepayment may reduce the amount of my monthly payments beginning with the monthly payment due after the Interest Change Date following the partial Prepayment. After the first Interest Change Date, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then:  (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.  BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  15 calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be   5.000% or $  5.00 whichever is greater of my overdue payment of interest during the period when my payment is interest only, and of principal and interest after that. I will pay this late charge promptly but only once on each late payment.

### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D)  No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorney's fees.

## 8.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

**(A) UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

### Transfer of the Property or a Beneficial Interest in Borrower.

As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**(B) AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

### Transfer of the Property or a Beneficial Interest in Borrower.

As used in this section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

0153483615

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)
MARGARET S. WISE                    -Borrower

EC009I  REV. 12/07/04

# ADJUSTABLE RATE RIDER

**(1-Year Treasury Index-Rate Caps)**
**(Assumable after Initial Period)**

0153483615

This Adjustable Rate Rider is made this <u>26th day of JUNE, 2006</u> ......................., and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to ................................................... <u>WELLS FARGO BANK, N.A.</u> ................................................................................................................................ (the "Lender") of the same date and covering the property described in the Security Instrument and located at: <u>2009 ERNEST AVENUE, REDONDO BEACH, CA 90278</u> .....................................................................

<div align="center">(Property Address)</div>

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an Initial Interest Rate of ..<u>6.375</u>.... %. The Note provides for changes in the interest rate and the monthly payments as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The Interest Rate I will pay may change on the first day of <u>JULY, 2011</u> ....................................., and may change on that day every <u>12</u> th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date".

### (B) The Index

Beginning with the first Interest Change Date, my interest rate will be based on an

Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

ADJUSTABLE RATE RIDER-1-Year Treasury Index (Assumable after Initial Period)

IO036A Rev. 06/03/05

**(C)  Calculation of Changes**

0153483615

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **two and three-quarters percentage point(s) (   2.750%)** ...........................to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be the new interest rate until the next Interest Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Interest Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Interest Change Date will not be greater than __11.375__ % or less than __2.750__ % . Thereafter, my interest rate will never be increased or decreased on any single Interest Change Date by more than **two percentage point(s) (   2.000%)** from the rate interest I have been paying for the preceding _12_ months. My interest rate will never be greater than __11.375__ %

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

IO036C Rev. 03/30/05

## TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER                     0153483615

Section 18 of the Security Instrument is amended to read as follows:

**1. UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

Transfer of the Property or a Beneficial Interest in Borrower.

As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**2. AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1. ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

## Transfer of the Property or a Beneficial Interest in Borrower.

As used in this section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond fordeed, contract for deed, installment sales contract or escrow agreement, the intent of which is thetransfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

0153483615

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____(Seal)
MARGARET S. WISE                                    -Borrower

*page 4*

IO036G  Rev. 03/30/05

# EXHIBIT "B"




This page is part of your document - DO NOT DISCARD

06 1447706

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
06/30/06 AT 08:00am

## TITLE(S) :





L E A D   S H E E T

FEE

D.T.T.

FEE $

CODE
20    D.A. FEE Code 20        $ 2.00

CODE
19

CODE
9

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.        Number of AIN's Shown




THIS FORM IS NOT TO BE DUPLICATED

Recording Requested By:

·WELLS.FARGO BANK, N.A.
18801 VENTURA BLVD 301
TARZANA, CA 91356-

Return To:
WELLS FARGO BANK, N.A.
FINAL DOCUMENTS X9999-01M
1000 BLUE GENTIAN ROAD
EAGAN, MN 55121-1663

Prepared By:
PROCESSING WHOLESALE
WELLS FARGO BANK, N.A.
18801 VENTURA BLVD 301
TARZANA, CA 91356-

**06 1447706**

238535263                    [Space Above This Line For Recording Data]

# DEED OF TRUST

0153483615

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **JUNE 26, 2006** together with all Riders to this document.

(B) "Borrower" is
**MARGARET S. WISE, AN UNMARRIED WOMAN**

Borrower is the trustor under this Security Instrument.

(C) "Lender" is  WELLS FARGO BANK, N.A.

Lender is a  National Association
organized and existing under the laws of  THE UNITED STATES OF AMERICA

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Page 1 of 18        Initials: _____

FORM 3005   1/01

SCA01   Rev. 11/09/00

Lender's address is
P. O. BOX 5137, DES MOINES, IA  50306-5137
Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is  FIDELITY NATIONAL TITLE INSURANCE COMPANY

(E) "Note " means the promissory note signed by Borrower and dated  JUNE 26, 2006
The Note states that Borrower owes Lender  NINE HUNDRED FORTY THOUSAND AND
NO/100                                                                                                                        Dollars
(U.S. $ .....940,000.00...........) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than   JULY 1, 2036
(F) "Property" means the property that is described below under the heading "Transfer of
Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges
and late charges due under the Note, and all sums due under this Security Instrument, plus
interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower.
The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as
well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an
electronic terminal, telephonic instrument, computer, or magnetic tape so as to order,
instruct, or authorize a financial institution to debit or credit an account. Such term includes,
but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers
initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation
or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or
(iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et
seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be
amended from time to time, or any additional or successor legislation or regulation that

06 1447706



governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(Q)** "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's convenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| County | of | LOS ANGELES |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

A.P.N.#4150-019-016
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

SEE EXHIBIT "A
ATTACHED

THIS IS A PURCHASE MONEY MORTGAGE.

Parcel ID Number:                                which currently has the address of
2009 ERNEST AVENUE                                                            [Street]
REDONDO BEACH
("Property Address"):                [City] , California       90278       [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

06 1447706

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

06 1447706

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be

06 1447706

required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination

06 1447706

or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In



06 1447706

either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or



06 1447706

(c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

06 1447706

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

SCA10   Rev 09/22/00          Page 10 of 18      Initials:       FORM 3005   1/01

06  1447706

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by

06 1447706

this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provision of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly

06 1447706

requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.



06 1447706

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer or servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.

The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environment Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or

06 1447706

before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

06 1447706

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                    _____ (Seal)
                                                 MARGARET S. WISE                    Borrower

06 1447706

19

State of California,                                                    ss:

County of LOS Angeles

On 6-27-06 before me, Teri Radford — a notary public

MARGARET S. WISE, AN UNMARRIED WOMAN                        personally appeared

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.

WITNESS my hand and official seal.



TERI RADFORD
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 1585043
LOS ANGELES COUNTY
My Comm. Exp. June 5, 2010

(Seal)

06 1447706

# EXHIBIT "C"




**This page is part of your document - DO NOT DISCARD**



## 20111102742



**Pages:**
**0004**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**08/16/11 AT 01:00PM**

| | |
|---|---|
| FEES: | 24.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 24.00 |





**L E A D S H E E T**



201108160770145

00004525169

003447135

**SEQ:**
**01**

DAR - Mail (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**




E530007

Recording requested by, and when
recorded, return to:

Wells Fargo Home Mortgage
Yves Kenao, x9999-018
PO Box 1629
Minneapolis, MN 55440-9790



08/16/2011

*20111102742*

---

IIIIIIIIIIIIIIIIIIIIIIIIII                                        (Space above this line for recorder use only)

## ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned, hereby grants, assigns, and transfers to:

**US Bank National Association, as Trustee for Citigroup Mortgage Loan Trust Inc., Mortgage Pass-Through Certificates, Series 2006-AR9**
4801 Frederica Street, Owensboro, KY 42301

all beneficial interest under that certain Deed of Trust dated: June 26, 2006
executed by: Margaret S. Wise, an unmarried women

Beneficiary:    Wells Fargo Bank, N.A.
Trustee:         Fidelity National Title Insurance Company

And recorded as Instrument # 06 1447706 and/or in Book N/A, Page N/A on June 30, 2006 of Official Records in the County Recorder's office of Los Angeles County, CA, describing land therein as:

| | |
|---|---|
| **Legal Description:** | **See Attached** |
| **Property Address:** | 2009 Ernest Avenue, Redondo Beach, California 90278 |
| **Parcel ID #:** | **4150-019-016** |

**Loan Amount:**     $940,000.00

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

Signed this  _7·/9·//_ .                                    Wells Fargo Bank, N.A.

Name:    Carla Naughton
Title: Vice President Loan Documentation

See Page 2 for Notary Acknowledgement.

Page 1

STATE OF: MINNESOTA

COUNTY OF: DAKOTA

On ___7·19·11___ before me, _Steven T Schmidt_ , a notary public, personally

appeared ___Carla Naughton___ -Vice President Loan Documentation, Wells Fargo Bank,

N.A., who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the

within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies),

and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s)

acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of MINNESOTA that the foregoing is true and correct.

Witness my hand and official seal.

Signature _____ (Seal)

Notary Public: _Steven T Schmidt_

My commission expires: _1-31-2014_

State of MINNESOTA, Certified in the County of _Hennepin_

Commission #: _20122451_

```
STEVEN T SCHMIDT
Notary Public
Minnesota
My Commission Expires Jan. 31, 2014
```

4

## Legal Description

All that certain real property situated in the County of Los Angeles, State of California, described as follows:

Lot 17 in Block 31 of Redondo Villa Tract "B", in the City of Redondo Beach, County of Los Angeles, State of California, as per map recorded in Book 11, Page(s) 110, of Maps, in the Office of the County Recorder of said County.

Assessor's Parcel Number:      **4150-019-016**

# EXHIBIT "D"

 

**This page is part of your document - DO NOT DISCARD**





# 20111073344

Pages:
0004

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**08/10/11 AT 08:22AM**

| | |
|---|---|
| FEES: | 24.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 24.00 |

 



L E A D S H E E T



201108100990005

00004511878



003441346

**SEQ:
01**

Daily ERDS





**THIS FORM IS NOT TO BE DUPLICATED**



E12

Recording Requested By:
First American Title Insurance Company

When Recorded Mail To:
**First American Trustee Servicing Solutions, LLC**
**6 Campus Circle, 2nd Floor**
**Westlake, TX 76262**

---

TS No. :    CA1100233521
TSG No. :   5719921

**Pursuant to California Civil Code Section 2924c(b)(1) please be advised of the following:**

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST
### IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account into good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five days business days prior to the date set for the sale of your property. No sale date may be set until approximately 90 days from the date this Notice of Default may be recorded (which date of recordation appears on this notice).

This amount is **$54,500.90 as of 08/05/2011**, and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than approximately 90 days after this notice of default is recorded) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2);

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

**Wells Fargo Home Mortgage**
**c/o First American Trustee Servicing Solutions, LLC**
**6 Campus Circle, 2nd Floor**
**Westlake, TX 76262**
**877-276-1894**

TS No.:        CA1100233521
VA/FHA/PMI No.:

# NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

**Remember,** YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN: That **First American Trustee Servicing Solutions, LLC** is either the original trustee, the duly appointed substitute trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated **06/26/2006**, executed by:

**MARGARET S. WISE, AN UNMARRIED WOMAN,**

as Trustor(s) to secure certain obligations in favor of WELLS FARGO BANK, N.A. as Beneficiary, recorded **06/30/2006**, (as Instrument No.) 06 1447706, (in Book) , (Page)   of Official Records in the Office of the Recorder of Los Angeles County, California describing land therein as:

## AS MORE FULLY DESCRIBED IN THE ABOVE MENTIONED DEED OF TRUST

said obligations including ONE NOTE FOR THE ORIGINAL sum of $940,000.00.

That a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

**THE INSTALLMENT OF PRINCIPAL AND INTEREST WHICH BECAME DUE ON 11/1/2010 AND ALL SUBSEQUENT INSTALLMENTS, TOGETHER WITH LATE CHARGES AS SET FORTH IN SAID NOTE AND DEED OF TRUST; ADVANCES, ASSESSMENTS, FEES, AND/OR TRUSTEE FEES; NOTHING IN THIS NOTICE SHALL BE CONSTRUED AS A WAIVER OF ANY FEES OWING TO THE BENEFICIARY UNDER THE DEED OF TRUST, PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS.**

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said agent, a written Declaration of Default and Demand for same, and has deposited with said agent such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

Dated: Aug 05, 2011

<div style="margin-left:40%">

First American Trustee Servicing Solutions, LLC
6 Campus Circle, 2nd Floor
Westlake TX 76262

By: _____ (signature)

Name: **WENDY RANDALL**

Title: _____

</div>

**First American Trustee Servicing Solutions, LLC MAY BE ACTING AS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED MAY BE USED FOR THAT PURPOSE.**

See Attached Declaration

# NOTICE OF DEFAULT DECLARATION
## PURSUANT TO CALIFORNIA CIVIL CODE 2923.5

Wells Fargo Bank, N.A.
3476 Stateview Blvd.
Fort Mill, SC 29715

Borrower: MARGARET S WISE
Co Borrower:
Property Address: 2009  ERNEST AVENUE
REDONDO BEACH, CA 90278

The undersigned mortgagee, beneficiary, or their authorized agent (collectively, the "Beneficiary") represent and declares that the requirements of CA Civil Code 2923.5 have been met. This Declaration is required for any residential owner occupied property in which the loan was originated between January 1, 2003 and December 31, 2007. Non-owner occupied and vacant properties are exempt from the requirements of CA Civil Code 2923.5.

The requirement indicated by "X" was met by the Beneficiary:

___ The Beneficiary has made contact with the borrower pursuant to CA Civil Code 2923(a)(2). Contact with the borrower was made in person or by telephone to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure.

✓ Due Diligence to contact the borrower was exercised pursuant to CA Civil Code 2923.5(g)(2) by the Beneficiary.

___ The borrower has surrendered the property as evidenced by either a letter confirming the surrender or delivery of the keys to the property to the mortgagee, Trustee, beneficiary, or authorized agent pursuant to CA Civil Code 2923.5(h)(1).

___ The borrower has contracted with an organization, person, or entity whose primary business is advising people who have decided to leave their homes on how to extend the foreclosure process and avoid their contractual obligations to mortgagees or beneficiaries pursuant to CA Civil Code 2923.5(h)(2).

___ The borrower has filed for bankruptcy and the proceedings have not been finalized pursuant to CA Civil Code 2923.5(h)(3).

___ An Exemption as identified in 2923.5 (h) & (i) applies: The loan did not originate between January 1, 2003 and December 31, 2007 or the property is deemed Non-owner occupied or vacant.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: 7-21-11

Wells Fargo Bank, N.A.

Shakanda L. Byers

VP of Loan Documentation

# EXHIBIT "E"

mcdonnell
PROPERTY ANALYTICS

www.mcdonnellanalytics.com

# Bloomberg Research Results

*September 18, 2011*

Borrower:  Margaret Wise
Lender:  Wells Fargo Bank, N.A.
Date of Transaction:  June 26, 2006

Our inquiry using Bloomberg Professional's Loan Search engine successfully traced your loan, which was securitized into the **Citigroup Mortgage Loan Trust 2006-AR9**.  The Loan Level Details on the following pages match the characteristics of the Adjustable Rate Rider to your Deed of Trust.



**McDonnell Property Analytics, Inc.**
© 2011 Bloomberg

**mcdonnell**
PROPERTY ANALYTICS

www.mcdonnellanalytics.com

# Bloomberg Research Results

*September 18, 2011*

Borrower: Margaret Wise
Lender: Wells Fargo Bank, N.A.
Date of Transaction: June 26, 2006

| BLOOMBERG FIELDS | BLOOMBERG LOAN LEVEL DETAILS |
|---|---|
| Loan | 30095555 |
| Pay History | F9999999666663CCCC3CCCCC |
| Current Amount | $937,855.37 |
| Original Amount | $940,000.00 |
| Group(s) | 0, 1 |
| Modifications | |
| Modification Date | |
| Rate | 6.375% |
| Previous Rate | 0 |
| Principal & Interest | $4,993.75 |
| Previous Principal & Interest | $0.00 |
| Interest Only Term | 0 |
| Documentation | Limited |
| Original Loan To Value | 80% |
| Amortization Loan To Value | 79.82% |
| HA Loan To Value | 114.53% |
| FICO Score | 699 |
| Age | 61 |
| Months To Maturity | 299 |
| Type | ARM |
| Index | T1Y |
| Initial MTR | -1 |

**McDonnell Property Analytics, Inc.**
© 2011 Bloomberg

**mcdonnell**
PROPERTY ANALYTICS

www.mcdonnellanalytics.com

# Bloomberg Research Results

*September 18, 2011*

Borrower:  Margaret Wise
Lender:  Wells Fargo Bank, N.A.
Date of Transaction:  June 26, 2006

| | |
|---|---|
| Life Cap – Interest Rate | 11.38% |
| Life Floor – Interest Rate | 2.75% |
| Adjustable Rate Cap | 2% |
| Adjustable Rate Floor | 0% |
| Margin | 2.75% |
| Geographic Region | CA |
| Delinquency Days | - |
| Special Servicing | Foreclosure |
| Property Type | Multi_Family-2F |
| Occupancy | Own |
| Purpose | Purchase |
| Origination | Jul-06 |
| Zip Code | 90278 |
| MSA | Los Angeles-Long Beach-Santa Ana, CA |
| Servicing Fees | 0.25% |
| Lien | |
| #Months B/F/R | 1 |

**McDonnell Property Analytics, Inc.**
© 2011 Bloomberg

# EXHIBIT "F"

Prospectus Supplement dated November 29, 2006 (To Prospectus dated November 28, 2006)

## $632,051,100 (Approximate; subject to a permitted variance of plus or minus 5%)

### Citigroup Mortgage Loan Trust 2006-AR9
Issuing Entity

## Mortgage Pass-Through Certificates, Series 2006-AR9

### Citigroup Mortgage Loan Trust Inc.
Depositor

### Citigroup Global Markets Realty Corp.
Sponsor

### Wells Fargo Bank, N.A.
Servicer

### CitiMortgage, Inc.
Master Servicer and Trust Administrator

### Citibank, N.A.
Paying Agent, Certificate Registrar and Authenticating Agent

---

You should consider carefully the risk factors beginning on page S-15 in this prospectus supplement and page 5 in the prospectus.

This prospectus supplement may be used to offer and sell the certificates offered hereby only if accompanied by the prospectus. The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of the sponsor, the depositor, the servicer, the master servicer, the paying agent, the certificate registrar or the authenticating agent.

---

| | |
|---|---|
| **Offered Certificates** | The trust created for the Series 2006-AR9 certificates will hold a pool of one- to four-family residential first lien mortgage loans separated into two collateral pools. The trust will issue fifteen classes of certificates that are offered pursuant to this prospectus supplement. You can find a list of these classes, together with their initial certificate principal balances and pass-through rates, on page S-5 of this prospectus supplement. Credit enhancement for all of the group 1 offered certificates will be provided in the form of excess interest, subordination and overcollateralization. In addition, the group 1 offered certificates will have the benefit of certain payments made pursuant to a cap contract. Credit enhancement for all of the group 2 offered certificates will be provided in the form of subordination. The offered certificates will be entitled to monthly distributions beginning in December 2006. |
| **Underwriting** | Citigroup Global Markets Inc., as underwriter, will offer to the public the offered certificates at varying prices to be determined at the time of sale. The proceeds to the depositor from the sale of the offered certificates, before deducting expenses, will be approximately 100.90% of the aggregate initial certificate principal balance of the offered certificates, plus accrued interest in the case of each class of Group 2 Certificates. See "Method of Distribution." |

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

The Attorney General of the State of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.

## Citigroup

**Important notice about information presented in this prospectus supplement and the accompanying prospectus**

**You should rely only on the information contained in this document. We have not authorized anyone to provide you with different information.**

We provide information to you about the offered certificates in two separate documents that progressively provide more detail:

- the accompanying prospectus, which provides general information, some of which may not apply to this series of certificates; and

- this prospectus supplement, which describes the specific terms of this series of certificates.

Citigroup Mortgage Loan Trust Inc.'s principal offices are located at 390 Greenwich Street, 6th Floor, New York, New York 10013 and its phone number is (212) 816-6000, Attention: Mortgage Finance.

## Table of Contents

### Prospectus Supplement

| | Page |
|---|---|
| SUMMARY OF PROSPECTUS SUPPLEMENT | S-3 |
| RISK FACTORS | S-15 |
| AFFILIATIONS AND RELATED TRANSACTIONS | S-28 |
| USE OF PROCEEDS | S-28 |
| THE MORTGAGE POOL | S-29 |
| THE ORIGINATOR | S-35 |
| YIELD ON THE GROUP 1 OFFERED CERTIFICATES | S-49 |
| YIELD ON THE GROUP 2 CERTIFICATES | S-60 |
| DESCRIPTION OF THE CERTIFICATES | S-71 |
| STATIC POOL INFORMATION | S-112 |
| THE SERVICER | S-112 |
| THE SPONSOR | S-115 |
| THE DEPOSITOR | S-116 |
| THE ISSUING ENTITY | S-117 |
| THE CAP PROVIDER | S-117 |
| POOLING AND SERVICING AGREEMENT | S-118 |
| FEDERAL INCOME TAX CONSEQUENCES | S-128 |
| METHOD OF DISTRIBUTION | S-133 |
| SECONDARY MARKET | S-133 |
| LEGAL OPINIONS | S-134 |
| RATINGS | S-134 |
| LEGAL INVESTMENT | S-134 |
| ERISA CONSIDERATIONS | S-135 |
| ANNEX I | I-1 |
| ANNEX II | II-1 |
| ANNEX III | III-1 |

## SUMMARY OF PROSPECTUS SUPPLEMENT

The following summary is a very broad overview of the certificates offered by this prospectus supplement and does not contain all of the information that you should consider in making your investment decision. To understand all of the terms of the offered certificates, carefully read this entire prospectus supplement and the entire accompanying prospectus.

Title of Series.............................. Citigroup Mortgage Loan Trust Inc., Mortgage Pass-Through Certificates, Series 2006-AR9.

Cut-off Date ............................... November 1, 2006.

Closing Date................................ On or about November 30, 2006.

Issuing Entity ............................. Citigroup Mortgage Loan Trust 2006-AR9. The issuing entity will be established under a pooling and servicing agreement, as described under "Pooling and Servicing Agreement" in this prospectus supplement. *See "The Issuing Entity" in this prospectus supplement.*

Depositor.................................... Citigroup Mortgage Loan Trust Inc., a Delaware corporation and an affiliate of Citigroup Global Markets Inc. The depositor will deposit the mortgage loans into the trust. *See "The Depositor" in this prospectus supplement.*

Originator.................................... Wells Fargo Bank, N.A. (referred to in this prospectus supplement as Wells Fargo Bank), a national banking association, is the originator of all of the mortgage loans. *See "The Originator" in this prospectus supplement.*

Servicer ...................................... Wells Fargo Bank will be the servicer of all of the mortgage loans, and in such capacity Wells Fargo Bank is referred to in this prospectus supplement as the servicer. Any obligation specified to be performed by the master servicer in the prospectus will be, with respect to the servicing of the mortgage loans, an obligation to be performed by the servicer pursuant to the related servicing agreement or by the master servicer pursuant to the pooling and servicing agreement, as described herein. *See "The Servicers" in this prospectus supplement.*

Master Servicer ........................... CitiMortgage, Inc. (referred to in this prospectus supplement as CitiMortgage or the master servicer), a New York corporation and an affiliate of Citigroup Global Markets Inc. Any obligation specified to be performed by the master servicer in the prospectus will be, with respect to the servicing of the mortgage loans, an obligation to be performed by the servicer pursuant to the related servicing agreement or by the master servicer pursuant to the pooling and servicing agreement, as described herein. *See "Pooling and Servicing Agreement—The Master Servicer and Trust Administrator" in this prospectus supplement.*

| | |
|---|---|
| Sponsor and Seller ...................... | Citigroup Global Markets Realty Corp., a New York corporation and an affiliate of Citigroup Global Markets Inc. The sponsor will sell the mortgage loans to the depositor. *See "The Sponsor" in this prospectus supplement.* |
| Trust Administrator.................... | CitiMortgage, Inc. (referred to in this prospectus supplement as CitiMortgage or the trust administrator), a New York corporation and an affiliate of Citigroup Global Markets Inc. *See "Pooling and Servicing Agreement—The Master Servicer and Trust Administrator" in this prospectus supplement.* |
| Paying Agent, Certificate Registrar and Authenticating Agent........................................ | Citibank, N.A. (in such capacities referred to in this prospectus supplement as Citibank or the paying agent, certificate registrar or authenticating agent as applicable), a national banking association and an affiliate of Citigroup Global Markets Inc. *See "Pooling and Servicing Agreement—Citibank" in this prospectus supplement.* |
| Trustee ...................................... | U.S. Bank National Association, a national banking association. *See "Pooling and Servicing Agreement—The Trustee" in this prospectus supplement.* |
| Custodian ................................... | Citibank, N.A. (in such capacity referred to in this prospectus supplement as Citibank or the custodian), a national banking association and an affiliate of Citigroup Global Markets Inc., will be the custodian of all of the mortgage files. *See "Pooling and Servicing Agreement—The Custodian" in this prospectus supplement.* |
| Cap Provider ............................. | Bear Stearns Financial Products Inc. *See "The Cap Provider" in this prospectus supplement.* |
| Credit Risk Manager................... | Clayton Fixed Income Services Inc. *See "Pooling and Servicing Agreement—The Credit Manager" in this prospectus supplement.* |
| Distribution Dates ....................... | Distributions on the offered certificates will be made on the 25th day of each month, or, if that day is not a business day, on the next succeeding business day, beginning in December 2006. |
| Final Scheduled Distribution Date....................... | The final scheduled distribution date for (i) the Group 1 Certificates will be the distribution date in November 2036 and (ii) the Group 2 Certificates will be the distribution date in November 2036. The actual final distribution date for each class of certificates may be earlier, and could be substantially earlier, than the applicable final scheduled distribution date. |
| Offered Certificates.................... | Only the certificates listed in the immediately following table are being offered by this prospectus supplement. Each class of offered certificates will have the initial certificate principal balance and pass-through rate set forth or described in the immediately following table. |