# EXHIBIT C

# EXHIBIT C

POOLING AND SERVICING AGREEMENT

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;

ORIGINAL ISSUANCE OF CERTIFICATES

SECTION 2.01 - Conveyance of Mortgage Loans.

The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Mortgage Loans identified on the Mortgage Loan Schedule, the rights of the Depositor under the Mortgage Loan Purchase Agreement (except Section 18 thereof), and all other assets included or to be included in REMIC I-A and REMIC II-A. Such assignment includes all interest and principal received by the Depositor or the Master Servicer on or with respect to the Mortgage Loans (other than payments of principal and interest due on such Mortgage Loans on or before the Cut-off Date). The Depositor herewith delivers to the Trustee an executed copy of the Mortgage Loan Purchase Agreement, and the Trustee, on behalf of the Certificateholders, acknowledges receipt of the same.

In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with, the Trustee or a Custodian on its behalf, the following documents or instruments (a *"Mortgage File"*) with respect to each Mortgage Loan so transferred and assigned:

(i) The Mortgage Note, endorsed by manual or facsimile signature without recourse by the Originator or an Affiliate of the Originator in blank or to the Trustee showing a complete chain of endorsements from the named payee to the Trustee or from the named payee to the Affiliate of the Originator and from such Affiliate to the Trustee;

(ii) The original recorded Mortgage, noting the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording thereon or a copy of the Mortgage certified by the public recording office in those jurisdictions where the public recording office retains the original;

(iii) Unless the Mortgage Loan is registered on the MERS® System, an assignment to the Trustee in recordable form of the Mortgage which may be included, where permitted by local law, in a blanket assignment or assignments of the Mortgage to the Trustee, including any intervening assignments and showing a complete chain of title from the original mortgagee named under the Mortgage to the Person assigning the Mortgage Loan to the Trustee (or to

MERS, noting the presence of the MIN, if the Mortgage Loan is registered on the MERS®
System);

(iv) Any original assumption, modification, buydown or conversion-to- fixed-interest-rate
agreement applicable to the Mortgage Loan;

(v) With respect to any Mortgage Loan listed on the Mortgage Loan Schedule as subject to a
Primary Mortgage Insurance Policy, the original Primary Mortgage Insurance Policy or
certificate or a copy thereof; and

(vi) The original or a copy of the title insurance policy (which may be a certificate or a short
form policy relating to a master policy of title insurance) pertaining to the Mortgaged Property,
or in the event such original title policy is unavailable, a copy of the preliminary title report and
the lender's recording instructions, with the original to be delivered within 180 days of the
Closing Date or an attorney's opinion of title in jurisdictions where such is the customary
evidence of title.

In instances where an original recorded Mortgage cannot be delivered by the Depositor to the
Trustee (or a Custodian on behalf of the Trustee) prior to or concurrently with the execution and
delivery of this Agreement, due to a delay in connection with the recording of such Mortgage,
the Depositor may, (a) in lieu of delivering such original recorded Mortgage referred to in clause
(ii) above, deliver to the Trustee (or a Custodian on behalf of the Trustee) a copy thereof,
provided that the Depositor certifies that the original Mortgage has been delivered to a title
insurance company for recordation after receipt of its policy of title insurance or binder therefor
(which may be a certificate relating to a master policy of title insurance), and (b) in lieu of
delivering the completed assignment in recordable form referred to in clause (iii) above to the
Trustee (or a Custodian on behalf of the Trustee), deliver such assignment to the Trustee (or a
Custodian on behalf of the Trustee) completed except for recording information. In all such
instances, the Depositor will deliver the original recorded Mortgage and completed assignment
(if applicable) to the Trustee (or a Custodian on behalf of the Trustee) promptly upon receipt of
such Mortgage. In instances where an original recorded Mortgage has been lost or misplaced, the
Depositor or the related title insurance company may deliver, in lieu of such Mortgage, a copy of
such Mortgage bearing recordation information and certified as true and correct by the office in
which recordation thereof was made. In instances where the original or a copy of the title
insurance policy referred to in clause (vi) above (which may be a certificate relating to a master
policy of title insurance) pertaining to the Mortgaged Property relating to a Mortgage Loan
cannot be delivered by the Depositor to the Trustee (or a Custodian on behalf of the Trustee)
prior to or concurrently with the execution and delivery of this Agreement because such policy is
not yet available, the Depositor may, in lieu of delivering the original or a copy of such title
insurance referred to in clause (vi) above, deliver to the Trustee (or a Custodian on behalf of the
Trustee) a binder with respect to such policy (which may be a certificate relating to a master
policy of title insurance) and deliver the original or a copy of such policy (which may be a

certificate relating to a master policy of title insurance) to the Trustee (or a Custodian on behalf of the Trustee) within 180 days of the Closing Date, in instances where an original assumption, modification, buydown or conversion-to-fixed-interest-rate agreement cannot be delivered by the Depositor to the Trustee (or a Custodian on behalf of the Trustee) prior to or concurrently with the execution and delivery of this Agreement, the Depositor may, in lieu of delivering the original of such agreement referred to in clause (iv) above, deliver a certified copy thereof.

To the extent not already recorded, except with respect to any Mortgage Loan for which MERS is identified on the Mortgage or on a properly recorded assignment of the Mortgage as the mortgagee of record, the Master Servicer, at the expense of the Seller shall promptly (and in no event later than five Business Days following the later of the Closing Date and the date of receipt by the Master Servicer of the recording information for a Mortgage) submit or cause to be submitted for recording, at no expense to any Trust REMIC, in the appropriate public office for real property records, each Assignment delivered to it pursuant to (iii) above. In the event that any such Assignment is lost or returned unrecorded because of a defect therein, the Master Servicer, at the expense of the Seller, shall promptly prepare or cause to be prepared a substitute Assignment or cure or cause to be cured such defect, as the case may be, and thereafter cause each such Assignment to be duly recorded. Notwithstanding the foregoing, but without limiting the requirement that such Assignments be in recordable form, neither the Master Servicer nor the Trustee shall be required to submit or cause to be submitted for recording any Assignment delivered to it or a Custodian pursuant to (iii) above if such recordation shall not, as of the Closing Date, be required by the Rating Agencies, as a condition to their assignment on the Closing Date of their initial ratings to the Certificates, as evidenced by the delivery by the Rating Agencies of their ratings letters on the Closing Date; provided, however, notwithstanding the foregoing, the Master Servicer shall submit each Assignment for recording, at no expense to the Trust Fund or the Master Servicer, upon the earliest to occur of: (A) reasonable direction by Holders of Certificates entitled to at least 25% of the Voting Rights, (B) the occurrence of a Master Servicer Event of Termination, (C) the occurrence of a bankruptcy, insolvency or foreclosure relating to the Seller, (D) the occurrence of a servicing transfer as described in Section 7.02 of this Agreement and (E) with respect to any one Assignment the occurrence of a foreclosure relating to the Mortgagor under the related Mortgage. Notwithstanding the foregoing, if the Seller fails to pay the cost of recording the Assignments, such expense will be paid by the Master Servicer and the Master Servicer shall be reimbursed for such expenses by the Trust as set forth herein.

In connection with the assignment of any Mortgage Loan registered on the MERS System, the Depositor further agrees that it will cause, within 30 Business Days after the Closing Date, the MERS System to indicate that such Mortgage Loans have been assigned by the Depositor to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including in such computer files (a) the code in the field which identifies the specific Trustee and (b) the code in the field *"Pool Field"* which identifies the series of the Certificates issued in connection

with such Mortgage Loans. The Depositor further agrees that it will not, and will not permit the Master Servicer to, and the Master Servicer agrees that it will not and will not permit a Sub-Servicer to, alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

With respect to a maximum of approximately 5.00% of the Original Mortgage Loans, by outstanding principal balance of the Original Mortgage Loans as of the Cut-off Date, if any original Mortgage Note referred to in (i) above cannot be located, the obligations of the Depositor to deliver such documents shall be deemed to be satisfied upon delivery to the Trustee (or a Custodian on behalf of the Trustee) of a photocopy of such Mortgage Note, if available, with a lost note affidavit. If any of the original Mortgage Notes for which a lost note affidavit was delivered to the Trustee (or a Custodian on behalf of the Trustee) is subsequently located, such original Mortgage Note shall be delivered to the Trustee (or a Custodian on behalf of the Trustee) within three Business Days.

The Depositor shall deliver or cause to be delivered to the Trustee (or a Custodian on behalf of the Trustee) promptly upon receipt thereof any other original documents constituting a part of a Mortgage File received with respect to any Mortgage Loan, including, but not limited to, any original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan.

All original documents relating to the Mortgage Loans that are not delivered to the Trustee (or a Custodian on behalf of the Trustee) are and shall be held by or on behalf of the Seller, the Depositor or the Master Servicer, as the case may be, in trust for the benefit of the Trustee on behalf of the Certificateholders. In the event that any such original document is required pursuant to the terms of this Section to be a part of a Mortgage File, such document shall be delivered promptly to the Trustee (or a Custodian on behalf of the Trustee). Any such original document delivered to or held by the Depositor that is not required pursuant to the terms of this Section to be a part of a Mortgage File, shall be delivered promptly to the Master Servicer.

Wherever it is provided in this Section 2.01 that any document, evidence or information relating to a Mortgage Loan be delivered or supplied to the Trustee, the Depositor shall do so by delivery thereof to the Trustee or Custodian on behalf of the Trustee.

It is agreed and understood by the parties hereto that it is not intended that any Mortgage Loan to be included in the Trust Fund be (i) a *"High-Cost Home Loan"* as defined in the New Jersey Home Ownership Act effective November 27, 2003, (ii) a *"High-Cost Home Loan"* as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, (iii) a *"High-Cost Home Mortgage Loan"* as defined in the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004 or (iv) a *"High Cost Home Loan"* as defined in the Indiana Home Loan Practices Act effective January 1, 2005. It is agreed and understood by the parties hereto that it is

not intended that any Mortgage Loan to be included in the Trust Fund not comply in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable predatory and abusive lending laws.

SECTION 2.02- Acceptance of the Trust Fund
by the Trustee.

Subject to the provisions of Section 2.01 and subject to any exceptions noted on an exception report delivered by or on behalf of the Trustee, the Trustee acknowledges receipt of the documents referred to in Section 2.01 (other than such documents described in Section 2.01(iv)) and all other assets included in the definition of *"Trust Fund"* and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage File, and that it holds or will hold all such assets and such other assets included in the definition of *"Trust Fund"* in trust for the exclusive use and benefit of all present and future Certificateholders.

The Trustee, by execution and delivery hereof, acknowledges receipt, subject to the review described in the succeeding sentence, of the documents and other property referred to in Section 2.01 and declares that the Trustee (or a Custodian on behalf of the Trustee) holds and will hold such documents and other property, including property yet to be received in the Trust Fund, in trust, upon the trusts herein set forth, for the benefit of all present and future Certificateholders. The Trustee or a Custodian on its behalf shall, for the benefit of the Trustee and the Certificateholders, review each Mortgage File within 90 days after execution and delivery of this Agreement, to ascertain that all required documents have been executed, received and recorded, if applicable, and that such documents relate to the Mortgage Loans. If in the course of such review the Trustee or a Custodian on its behalf finds a document or documents constituting a part of a Mortgage File to be defective in any material respect, the Trustee or a Custodian on its behalf shall promptly so notify the Depositor, the Trust Administrator, the Paying Agent, the Seller, the Master Servicer and, if such notice is from a Custodian on the Trustee's behalf, the Trustee. In addition, upon the discovery by the Depositor, the Master Servicer, the Trust Administrator, the Paying Agent or the Trustee of a breach of any of the representations and warranties made by the Seller in the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan which materially adversely affects such Mortgage Loan or the interests of the related Certificateholders in such Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties.

The Depositor and the Trustee intend that the assignment and transfer herein contemplated constitute a sale of the Mortgage Loans, the related Mortgage Notes and the related documents, conveying good title thereto free and clear of any liens and encumbrances, from the Depositor to the Trustee in trust for the benefit of the Certificateholders and that such property not be part of the Depositor's estate or property of the Depositor in the event of any insolvency by the

Depositor. In the event that such conveyance is deemed to be, or to be made as security for, a loan, the parties intend that the Depositor shall be deemed to have granted and does hereby grant to the Trustee a first priority perfected security interest in all of the Depositor's right, title and interest in and to the Mortgage Loans, the related Mortgage Notes and the related documents, and that this Agreement shall constitute a security agreement under applicable law.

The Trustee may, concurrently with the execution and delivery hereof or at any time thereafter, enter into a custodial agreement with a Custodian pursuant to which the Trustee appoints a Custodian to hold the Mortgage Files on behalf of the Trustee for the benefit of the Trustee and all present and future Certificateholders, which may provide that the Custodian shall, on behalf of the Trustee, conduct the review of each Mortgage File required under the first paragraph of this Section 2.02. Initially, Citibank, N.A., is appointed as Custodian with respect to the Mortgage Files of all the Mortgage Loans and, notwithstanding anything to the contrary herein, it is understood that such initial Custodian shall be responsible for the review contemplated in the second paragraph of this Section 2.02 and for all other functions relating to the receipt, review, reporting and certification provided for herein with respect to the Mortgage Files (other than ownership thereof for the benefit of the Certificateholders and related duties and obligations set forth herein).

A True and Correct copy can be found at http://www.secinfo.com/dqTm6.uxn.c.htm#1stPage

# EXHIBIT D

 

## This page is part of your document - DO NOT DISCARD



# 20111102742



**Pages:**
**0004**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**08/16/11 AT 01:00PM**

| | |
|---|---|
| FEES: | 24.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 24.00 |





**L E A D S H E E T**



201108160770145

00004525169

003447135

**SEQ:**
**01**

DAR - Mail (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**



E530007

Recording requested by, and when
recorded, return to:

Wells Fargo Home Mortgage
Yves Kenao, x9999-018
PO Box 1629
Minneapolis, MN  55440-9790



08/16/2011

*20111102742*

(Space above this line for recorder use only)

### ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned, hereby grants, assigns, and transfers to:

**US Bank National Association, as Trustee for Citigroup Mortgage Loan Trust Inc., Mortgage Pass-Through Certificates, Series 2006-AR9**
4801 Frederica Street, Owensboro, KY 42301

all beneficial interest under that certain Deed of Trust dated: June 26, 2006
executed by: Margaret S. Wise, an unmarried women

Beneficiary:    Wells Fargo Bank, N.A.
Trustee:        Fidelity National Title Insurance Company

And recorded as Instrument # 06 1447706 and/or in Book N/A, Page N/A on June 30, 2006 of Official Records in the County Recorder's office of Los Angeles County, CA, describing land therein as:

| | |
|---|---|
| Legal Description: | **See Attached** |
| Property Address: | 2009 Ernest Avenue, Redondo Beach, California 90278 |
| Parcel ID #: | **4150-019-016** |
| Loan Amount: | $940,000.00 |

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

Signed this ___7·19·11___ .

**Wells Fargo Bank, N.A.**

Name: _____Carla Naughton_____
Title: Vice President Loan Documentation

See Page 2 for Notary Acknowledgement.

Page 1

STATE OF: MINNESOTA

COUNTY OF: DAKOTA

On _7·19·11_ before me, _Steven T Schmidt_, a notary public, personally appeared ___Carla Naughton___ ‑Vice President Loan Documentation, Wells Fargo Bank, N.A., who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of MINNESOTA that the foregoing is true and correct.

Witness my hand and official seal.

Signature _____ (Seal)

Notary Public: _Steven T Schmidt_

My commission expires: _1·31·2014_

State of MINNESOTA, Certified in the County of _Hennepin_

Commission #: _20122457_

```
STEVEN T SCHMIDT
Notary Public
Minnesota
My Commission Expires Jan. 31, 2014
```

## Legal Description

All that certain real property situated in the County of Los Angeles, State of California, described as follows:

Lot 17 in Block 31 of Redondo Villa Tract "B", in the City of Redondo Beach, County of Los Angeles, State of California, as per map recorded in Book 11, Page(s) 110, of Maps, in the Office of the County Recorder of said County.

Assessor's Parcel Number:          **4150-019-016**

# EXHIBIT E




**This page is part of your document - DO NOT DISCARD**



## 20111073344



Pages:
0004

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**08/10/11 AT 08:22AM**

| | | |
|---|---|---|
| FEES: | | 24.00 |
| TAXES: | | 0.00 |
| OTHER: | | 0.00 |
| PAID: | | 24.00 |





**L E A D S H E E T**



201108100990005

**00004511878**



003441346

**SEQ:**
**01**

Daily ERDS





**THIS FORM IS NOT TO BE DUPLICATED**

E534321

E12

Recording Requested By:
First American Title Insurance Company

When Recorded Mail To:
**First American Trustee Servicing Solutions, LLC**
6 Campus Circle, 2nd Floor
Westlake, TX 76262

TS No. :     CA1100233521
TSG No. :    5719921

Pursuant to California Civil Code Section 2924c(b)(1) please be advised of the following:

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

### IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account into good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five days business days prior to the date set for the sale of your property. No sale date may be set until approximately 90 days from the date this Notice of Default may be recorded (which date of recordation appears on this notice).

This amount is **$54,500.90** as of **08/05/2011**, and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than approximately 90 days after this notice of default is recorded) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2);

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

**Wells Fargo Home Mortgage**
**c/o First American Trustee Servicing Solutions, LLC**
**6 Campus Circle, 2nd Floor**
**Westlake, TX 76262**
**877-276-1894**

TS No.:        CA1100233521
VA/FHA/PMI No.:

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

**Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

NOTICE IS HEREBY GIVEN: That **First American Trustee Servicing Solutions, LLC** is either the original trustee, the duly appointed substitute trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated **06/26/2006**, executed by:

**MARGARET S. WISE, AN UNMARRIED WOMAN,**

as Trustor(s) to secure certain obligations in favor of **WELLS FARGO BANK, N.A.** as Beneficiary, recorded **06/30/2006**, (as Instrument No.) **06 1447706**, (in Book) , (Page)   of Official Records in the Office of the Recorder of **Los Angeles** County, California describing land therein as:

## AS MORE FULLY DESCRIBED IN THE ABOVE MENTIONED DEED OF TRUST

said obligations including ONE NOTE FOR THE ORIGINAL sum of **$940,000.00**.

That a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

**THE INSTALLMENT OF PRINCIPAL AND INTEREST WHICH BECAME DUE ON 11/1/2010 AND ALL SUBSEQUENT INSTALLMENTS, TOGETHER WITH LATE CHARGES AS SET FORTH IN SAID NOTE AND DEED OF TRUST, ADVANCES, ASSESSMENTS, FEES, AND/OR TRUSTEE FEES. NOTHING IN THIS NOTICE SHALL BE CONSTRUED AS A WAIVER OF ANY FEES OWING TO THE BENEFICIARY UNDER THE DEED OF TRUST, PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS.**

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said agent, a written Declaration of Default and Demand for same, and has deposited with said agent such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

Dated: Aug 05, 2011

<div style="margin-left:40%">

First American Trustee Servicing Solutions, LLC
6 Campus Circle, 2nd Floor
Westlake TX 76262

By: _____

Name: **WENDY RANDALL** (signature)

Title: _____

</div>

**First American Trustee Servicing Solutions, LLC MAY BE ACTING AS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED MAY BE USED FOR THAT PURPOSE.**

<div style="text-align:center">See Attached Declaration</div>

## NOTICE OF DEFAULT DECLARATION
PURSUANT TO CALIFORNIA CIVIL CODE 2923.5

Wells Fargo Bank, N.A.
3476 Stateview Blvd.
Fort Mill, SC 29715

Borrower: MARGARET S WISE
Co Borrower:
Property Address: 2009   ERNEST AVENUE
                  REDONDO BEACH, CA 90278

The undersigned mortgagee, beneficiary, or their authorized agent (collectively, the "Beneficiary")
represent and declares that the requirements of CA Civil Code 2923.5 have been met. This Declaration is
required for any residential owner occupied property in which the loan was originated between January 1,
2003 and December 31, 2007. Non-owner occupied and vacant properties are exempt from the
requirements of CA Civil Code 2923.5.

The requirement indicated by "X" was met by the Beneficiary:

___   The Beneficiary has made contact with the borrower pursuant to CA Civil Code
      2923(a)(2). Contact with the borrower was made in person or by telephone to assess the borrower's
      financial situation and explore options for the borrower to avoid foreclosure.

✓     Due Diligence to contact the borrower was exercised pursuant to CA Civil Code 2923.5(g)(2) by the
      Beneficiary.

___   The borrower has surrendered the property as evidenced by either a letter confirming the
      surrender or delivery of the keys to the property to the mortgagee, Trustee, beneficiary, or
      authorized agent pursuant to CA Civil Code 2923.5(h)(1).

___   The borrower has contracted with an organization, person, or entity whose primary
      business is advising people who have decided to leave their homes on how to extend the foreclosure
      process and avoid their contractual obligations to mortgagees or beneficiaries pursuant to CA Civil
      Code 2923.5(h)(2).

___   The borrower has filed for bankruptcy and the proceedings have not been finalized
      pursuant to CA Civil Code 2923.5(h)(3).

___   An Exemption as identified in 2923.5 (h) & (i) applies:  The loan did not originate
      between January 1, 2003 and December 31, 2007 or the property is deemed Non-owner occupied or
      vacant.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is
true and correct.

Dated: 7-21-11

Wells Fargo Bank N.A.
ShaKanda L. Byers
VP of Loan Documentation

# EXHIBIT F

First American Trustee Servicing Solutions, LLC
6 Campus Circle, 2nd Floor
Westlake, TX 76262
Telephone: (866) 429-5179
Fax:        (817) 699-1487

Aug 11, 2011

FILE NUMBER:   CA1100233521
MARGARET WISE
2009 ERNEST AVENUE
REDONDO BEACH, CA 90278

Re:   Loan No.:     0153483615
      TS #:         CA1100233521

The current creditor to whom the debt is owed is: WELLS FARGO BANK, N.A.. The loan is serviced by
Wells Fargo Home Mortgage. First American Trustee Servicing Solutions, LLC has been authorized by
the Servicer/Creditor to initiate foreclosure proceedings in connection with the foreclosure of a Deed of Trust
associated with your real estate loan.

The amount of the debt as of the date of this Notice according to the records of our client is $989,239.97. The
amount necessary to bring the loan into good standing and reinstate your mortgage is set forth in the enclosed Notice
of Default and Election to Sell Under Deed of Trust. Because of interest, late charges, and other charges that may
vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown
above or in the enclosed Notice of Default and Election to Sell Under Deed of Trust, an adjustment may be necessary
after we receive your check, in which case we will inform you before depositing the check for collection. For further
information, write the undersigned or call (866) 429-5179.

Please be advised that First American Trustee Servicing Solutions, LLC may be considered a debt collector
attempting to collect the above referenced debt. Any information obtained from you may be used for that purpose.
Federal law gives you thirty days after you receive this letter to dispute the validity of the debt or any part of it. If
you don't dispute it within that period, First American Trustee Servicing Solutions, LLC will assume that it's
valid. If you do dispute it - - by notifying First American Trustee Servicing Solutions, LLC in writing to that effect
- - First American Trustee Servicing Solutions, LLC will, as required by the law, obtain and mail to you proof of
the debt. And if, within the same period, you request in writing the name and address of your original creditor,
if the original creditor is different from the current creditor, First American Trustee Servicing Solutions, LLC
will furnish you with that information too.

The law does not require First American Trustee Servicing Solutions, LLC to wait until the end of thirty-
day period before taking action to collect this debt. If, however, you request proof of the debt or the name and
address of the original creditor within thirty days of receipt of this letter, the law requires LoanStar to suspend its
efforts (through litigation or otherwise) to collect the debt until First American Trustee Servicing Solutions,
LLC mails the requested information to you.

The state Rosenthal Fair Debt Collection Practices Act and the Federal Fair Debt Collection Practices Act require
that, except under unusual circumstances, collectors may not contact you before 8 a.m. or after 9 p.m. They may not
harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or
misleading statements or call you at work if they know that you may not receive personal calls at work. For the most
part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may
contact another person to confirm your location or enforce a judgment. For more information about debt collection
activities, you may contact the Federal Trade Commission at 1-877-FTC-HELP or www.ftd.gov.

Sincerely,
First American Trustee Servicing Solutions, LLC



# EXHIBIT G

August 21, 2011

Margaret Wise                                    Via Certified Mail
2009 Ernest Avenue                               Return Receipt Requested
Redondo Beach, CA 90278

To:      First American Trustee Servicing Solutions LLC
Subject: Request for Original Mortgage Note and Additional Information
Re:      Loan No. 0153483615   TSA#CA1100233521

To Whom It May Concern:

This is a qualified written request under Section 6 of the Real Estate Settlement Procedures Act
(RESPA). I own the property at the address listed above, and Wells Fargo Bank Home
Mortgage ("Servicer") services my mortgage.

Over the last several weeks there have been many stories documenting the problem that banks
are foreclosing on homes without proof that they own the loan. I have learned that in many
cases, banks like Wells Fargo Bank, N.A. (the "Bank") do not even know who owns the loans
the Servicer services. Employees at several leading banks have admitted to rubber stamping
tens of thousands of foreclosures every month, without even checking to make sure that the
bank had a legal right to proceed with foreclosure. In some cases, banks allegedly falsified
mortgage documents to cover up their mistakes. There have been reports of two banks trying to
foreclose on the same home, banks foreclosing on homeowners who were current on their
payments, and even of a bank foreclosing on a home where the homeowner had never taken
out a mortgage to begin with. This is not merely a "technical problem"– it is the difference
between having a warm bed at night and being out on the street.

As a homeowner and a customer of Wells Fargo, I am horrified. I had always believed that if I
played by the rules, I would be protected, but now I know that Wells Fargo thinks the rules don't
apply to them.

To protect myself, I need to know who owns my mortgage. Within sixty days, I would like to
know the name, address, and phone number of the bank or investor that owns my mortgage.
Furthermore, in light of the recent allegations of foreclosure fraud, **I demand to see the original
mortgage note proving ownership over my home loan**. If you fail to produce a mortgage
note proving that you have a right to collect my mortgage payments, I will be forced to consider
all options available to me to ensure that my home is protected.

Page 2


I ask that I receive my response in writing. I understand that under Section 6 of RESPA you are legally required to acknowledge my request within twenty business days and must try to resolve the issue within sixty days.

Thank you for your attention to this matter.

Sincerely,


Margaret Wise

cc:  Wells Fargo Bank, N.A. via certified mail
     Office of the Comptroller, OMB Control No. 1557-0232 via certified mail
     Kamala Harris, Office of the California State Attorney General, via certified mail

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Wells Fargo Home Mortgage
MAC X 7801-03K
3476 Stateview Blvd.
Fort Mill, SC 29715

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

FORT MILLS

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

AUG 2 5 2011

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7011 1570 0002 6106 8821

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

# EXHIBIT H



This page is part of your document - DO NOT DISCARD



**06 1447706**

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
**06/30/06 AT 08:00am**

TITLE(S) :



L E A D    S H E E T

FEE

D.T.T.



CODE
20    D.A. FEE Code 20    $ 2.00

CODE
19

CODE
9____

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.    Number of AIN's Shown



THIS FORM IS NOT TO BE DUPLICATED



LAWYERS TITLE

Recording Requested By:

·WELLS FARGO BANK, N.A.
18801 VENTURA BLVD 301
TARZANA, CA 91356-

06 1447706

Return To:
WELLS FARGO BANK, N.A.
FINAL DOCUMENTS X9999-01M
1000 BLUE GENTIAN ROAD
EAGAN, MN 55121-1663
Prepared By:
PROCESSING WHOLESALE
WELLS FARGO BANK, N.A.
18801 VENTURA BLVD 301
TARZANA, CA 91356-

238355763 ——— [Space Above This Line For Recording Data] ———

# DEED OF TRUST

0153483615

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **JUNE 26, 2006**
together with all Riders to this document.
**(B) "Borrower"** is
**MARGARET S. WISE, AN UNMARRIED WOMAN**

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is **WELLS FARGO BANK, N.A.**

Lender is a **National Association**
organized and existing under the laws of **THE UNITED STATES OF AMERICA**

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

FORM 3005   1/01

Page 1 of 18      Initials: _____

SCA01   Rev 11/09/00

Lender's address is
P. O. BOX 5137, DES MOINES, IA 50306-5137
Lender is the beneficiary under this Security Instrument.

(D) "Trustee" is FIDELITY NATIONAL TITLE INSURANCE COMPANY

(E) "Note " means the promissory note signed by Borrower and dated JUNE 26, 2006
The Note states that Borrower owes Lender NINE HUNDRED FORTY THOUSAND AND NO/100                                                                                      Dollars
(U.S. $ .....940,000.00............) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   JULY 1, 2036

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[x] Adjustable Rate Rider  [ ] Condominium Rider          [ ] Second Home Rider
[ ] Balloon Rider          [ ] Planned Unit Development Rider [x] 1-4 Family Rider
[ ] VA Rider               [ ] Biweekly Payment Rider      [ ] Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that

SCA02   Rev 12/18/00          Page 2 of 18        Initials:_____          FORM 3005   1/01

06 1447706



governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA. **(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's convenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| **County** | of | **LOS ANGELES** |
|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

**A.P.N.#4150-019-016**
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF**

### SEE EXHIBIT "A ATTACHED

### THIS IS A PURCHASE MONEY MORTGAGE.

Parcel ID Number:                                        which currently has the address of
**2009 ERNEST AVENUE**                                                          [Street]
**REDONDO BEACH**                    [City] , California          **90278**      [Zip Code]
**("Property Address"):**

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

SCA03   Rev 11/09/00          Page 3 of 18          Initials:          FORM 3005   1/01

06 1447706

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

06  1447706

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be

06 1447706

required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination

06 1447706

or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In

06 1447706

either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower
hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not
to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other
of Borrower's rights (other than the right to any refund of unearned premiums paid by
Borrower) under all insurance policies covering the Property, insofar as such rights are
applicable to the coverage of the Property. Lender may use the insurance proceeds either
to repair or restore the Property or to pay amounts unpaid under the Note or this Security
Instrument, whether or not then due.

   **6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's
principal residence within 60 days after the execution of this Security Instrument and shall
continue to occupy the Property as Borrower's principal residence for at least one year after
the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not
be unreasonably withheld, or unless extenuating circumstances exist which are beyond
Borrower's control.

   **7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower
shall not destroy, damage or impair the Property, allow the Property to deteriorate or
commit waste on the Property. Whether or not Borrower is residing in the Property,
Borrower shall maintain the Property in order to prevent the Property from deteriorating or
decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that
repair or restoration is not economically feasible, Borrower shall promptly repair the
Property if damaged to avoid further deterioration or damage. If insurance or condemnation
proceeds are paid in connection with damage to, or the taking of, the Property, Borrower
shall be responsible for repairing or restoring the Property only if Lender has released
proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration
in a single payment or in a series of progress payments as the work is completed. If the
insurance or condemnation proceeds are not sufficient to repair or restore the Property,
Borrower is not relieved of Borrower's obligation for the completion of such repair or
restoration.

   Lender or its agent may make reasonable entries upon and inspections of the Property.
If it has reasonable cause, Lender may inspect the interior of the improvements on the
Property. Lender shall give Borrower notice at the time of or prior to such an interior
inspection specifying such reasonable cause.

   **8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan
application process, Borrower or any persons or entities acting at the direction of Borrower
or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate
information or statements to Lender (or failed to provide Lender with material information)
in connection with the Loan. Material representations include, but are not limited to,
representations concerning Borrower's occupancy of the Property as Borrower's principal
residence.

   **9. Protection of Lender's Interest in the Property and Rights Under this Security
Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this
Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's
interest in the Property and/or rights under this Security Instrument (such as a proceeding
in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may
attain priority over this Security Instrument or to enforce laws or regulations), or

06 1447706



(c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

06 1447706

\\

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

06 1447706

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by



06  1447706

this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provision of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly

requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

SCA13  Rev 11/09/00          Page 13 of 18       Initials:_____       FORM 3005  1/01

06 1447706

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer or servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.

06 1447706

The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environment Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

*NON-UNIFORM COVENANTS.* Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or

06 1447706

before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee.  Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

06 1447706

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this *Security Instrument* and in any *Rider* executed by *Borrower* and recorded with it.

Witnesses:

_____

_____


_____ (Seal)
MARGARET S. WISE                    Borrower

06 1447706

19

State of California,                                                                    ss:

County of _LOS Angeles_

On _6-27-06_ before me, _Teri Radford - a notary public_

personally appeared

MARGARET S. WISE, AN UNMARRIED WOMAN

, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.



TERI RADFORD
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 1585043
LOS ANGELES COUNTY
My Comm. Exp. June 5, 2010

_____ ᗰ̃ᑌᖇᗩᗪᖴᗝᖇᗪ (Seal)

SCA18   Rev 10/17/00                  Page 18 of 18        Initials:_____   FORM 3005   1/01

06 1447706

20

# 1-4 FAMILY RIDER

## (Assignment of Rents)

0153483615

THIS 1-4 FAMILY RIDER is made this ..26th day of JUNE, 2006........................, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to ..WELLS FARGO BANK, N.A. ...................................................................................
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: .......2009 ERNEST AVENUE  .............................................................
................................REDONDO BEACH, CA  90278............................................................

*(Property Address)*

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items are now or hereafter attached to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF THE PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

MULTISTATE 1-4 FAMILY RIDER
FNMA/FHLMC Uniform Instrument

Form 3170 1/01  (Page 1 of 3)
EC024L Rev. 11/13/00

06 1447706

`2\`

0153483615

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H.* ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

MULTISTATE 1-4 FAMILY RIDER
FNMA/FNLMC Uniform Instrument

Form 3170 1/01   (Page 2 of 3)
EC024L  Rev. 11/13/00

06 1447706

0153483615

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

\* Section H is deleted in its entirety if the Property is located in the State of Michigan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____(Seal)
MARGARET S. WISE                    -Borrower

MULTISTATE 1-4 FAMILY RIDER
FNMA/FNLMC Uniform Instrument

Form 3170 1/01 (Page 3 of 3)
EC024L Rev. 11/13/00

06 1447706

23

# ADJUSTABLE RATE RIDER

(1-Year Treasury Index-Rate Caps)
(Assumable after Initial Period)

0153483615

This Adjustable Rate Rider is made this 26th day of JUNE, 2006 ........................., and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to ....................................................... WELLS FARGO BANK, N.A. ................................................................................................ (the "Lender") of the same date and covering the property described in the Security Instrument and located at: 2009 ERNEST AVENUE, REDONDO BEACH, CA 90278 .................................................................
(Property Address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an Initial Interest Rate of 6.375 %. The Note provides for changes in the interest rate and the monthly payments as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The Interest Rate I will pay may change on the first day of JULY, 2011 ..................................., and may change on that day every 12 th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date".

### (B) The Index

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

ADJUSTABLE RATE RIDER-1-Year Treasury Index (Assumable after Initial Period)

*page 1*

IO036A Rev. 06/03/05

06 1447706



**(C) Calculation of Changes**                                          0153483615

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **two and three-quarters percentage point(s) ( 2.750% )**..........................to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be the new interest rate until the next Interest Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Interest Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Interest Change Date will not be greater than **11.375** % or less than **2.750** % . Thereafter, my interest rate will never be increased or decreased on any single Interest Change Date by more than **two percentage point(s) ( 2.000% )** from the rate interest I have been paying for the preceding 12 months. My interest rate will never be greater than **11.375** %

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include *information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.*

08 1447706

## TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER     0153483615

Section 18 of the Security Instrument is amended to read as follows:

**1. UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

Transfer of the Property or a Beneficial Interest in Borrower.
As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**2. AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1. ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.**

As used in this section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2b

0153483615

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____marya_Sh_____ (Seal)
MARGARET S. WISE                      -Borrower

*page 4*                                IO036G  Rev. 03/30/05

06 1447706

File No: 02385357

## EXHIBIT "A"

All that certain real property situated in the County of Los Angeles, State of California, described as follows:

Lot 17 in Block 31 of Redondo Villa Tract "B", in the City of Redondo Beach, County of Los Angeles, State of California, as per map recorded in Book 11, Page(s) 110, of Maps, in the Office of the County Recorder of said County.

Assessor's Parcel Number:      **4150-019-016**

06 1447706

1

2

3

4

5

6

7

8

9

10

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

### NORTHWEST DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>     Plaintiff,<br><br>  v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; COUNTRYWIDE HOME LOANS, INC., a New York corporation; and FULL SPECTRUM LENDING, INC., a California corporation,<br><br>     Defendants. | Case No. **LC083076**<br><br>**STIPULATED JUDGMENT AND INJUNCTION**<br><br>L.A.S.C. - Northwest East<br>RECEIVED<br>OCT 14 2008 |

It appearing to this Court that Plaintiff, the People of the State of California, by and through Edmund G. Brown Jr., Attorney General, and Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., and Full Spectrum Lending, Inc. have resolved the matters in controversy between them and have consented to the terms of this judgment without the taking of evidence, and good cause having been shown, the Court hereby enters this

1    Stipulated Judgment and Injunction.

2            IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

3        1.     This Court has jurisdiction of the subject matter hereof and the parties hereto.

4        2.     Venue is proper in this Court.

5        3.     For purposes of this Stipulated Judgment and Injunction:

6            A.     "*Affiliate*" means, with respect to any company, any company that

7    controls, is under common control with, or is controlled by such company.

8            B.     "*Affordability Equation*" has the meaning given to such term in Section

9    6.3.4.

10           C.     "*Alt-A Residential Mortgage Loans*" means CFC Residential Mortgage

11   Loans that are (a) not owned by a GSE; (b) not Subprime; (c) not a Pay Option ARM; (d)

12   less than $400,000 in original principal amount, and (e) including documentation or other

13   characteristics that make such loans not Federal Eligible.

14           D.     "*Annual Increase*" means, with respect to any stated rate of interest, an

15   annual increase in the stated rate of interest such that the aggregate scheduled payments of

16   principal (if applicable) and interest in any year does not increase by more than 7.5% of

17   the aggregate scheduled payments of principal and interest in the preceding year, subject

18   to any stated interest rate cap.

19           E.     "*ARMs*" means adjustable rate first-lien residential mortgage loans.

20           F.     "*BAC*" means Bank of America Corporation.

21           G.     "*Borrower*" means, with respect to any owner-occupied CFC Residential

22   Mortgage Loan, the obligors(s) on such loan.  No covenant or commitment herein is

23   intended to require a CFC Servicer to deal with more than one obligor on behalf of any

24   Borrower with respect thereto.

25           H.     "*CFC*" means Countrywide Financial Corporation.

26           I.     "*CFC-Originated*" means, with respect to any residential mortgage loan,

27   that such residential mortgage loan is a first-lien residential mortgage that was originated

28   on a retail basis directly or indirectly by CFC or its subsidiaries or through brokers in their

2

1  wholesale lending channels.  "**CFC-Originated**" residential mortgage loans do not

2  include CFC Purchased Loans.

3    J.    "*CFC Purchased Loans*" means any first-lien residential mortgage loan

4  originated by unaffiliated third parties and directly or indirectly purchased by CFC or its

5  subsidiaries through their correspondent lending channels or otherwise, *provided* that such

6  loan is serviced by a CFC Servicer.  "*CFC Purchased Loans*" do not include CFC-

7  Originated residential mortgage loans.

8    K.    "*CFC Residential Mortgage Loans*" means any (a) CFC-Originated first-

9  lien residential mortgage loans, or (b) CFC Purchased Loans, so long as, in each case,

10  such loans are serviced by a CFC Servicer.

11    L.    "*CFC Servicer*" means CFC or any Affiliate of CFC that services CFC

12  Residential Mortgage Loans.

13    M.    "*CLTV*" means, with respect to a first-lien residential mortgage loan as of

14  the time underwritten, the ratio of the sum of the unpaid principal balance of such

15  mortgage loan *plus* the unpaid principal balance on any second-lien mortgage to the

16  Market Value of the residential property that secures such mortgages.

17    N.    "*Commencement Date*" means October 6, 2008.

18    O.    "*Countrywide Defendants*" means Countrywide Financial Corporation,

19  Countrywide Home Loans, Inc., and Full Spectrum Lending, Inc.

20    P.    "*Delinquent Borrower*" means, with respect to any Borrower, that the

21  related CFC Residential Mortgage Loan (a) is Seriously Delinquent on or before the

22  Termination Date, or (b) is subject to an imminent reset or Recast and, in the reasonable

23  view of the CFC Servicer, as a result of such reset or Recast is reasonably likely to

24  become Seriously Delinquent on or before the Termination Date.

25    Q.    "*Eligible Borrower*" has the meaning given to such term in Section 6.3.1.

26    R.    "*Fannie Mae*" means Federal National Mortgage Association.

27

28

<center>3</center>

S.   "*Fannie Rate*" means, as of any date, the Fannie Mae 30-year fixed rate 60-day delivery required net yield as of such date or if such rate is for any reason not available, a comparable rate published by another nationally recognized source.

T.   "*Federal Eligible*" means, with respect to any first-lien residential mortgage loan that, at the time of origination, (a) such loan is or was eligible for sale to, or guaranty or insurance by, a federal agency, GSE or comparable federally-sponsored entity similar to a GSE, under then applicable guidelines of such agency, GSE or entity, or (b) such loan was made in connection with a program intended to qualify for credit under the Community Reinvestment Act of 1977.

U.   "*Foreclosure Avoidance Budget*" has the meaning given to such term in Section 6.3.4(a).

V.   "*Foreclosure Relief Program*" means the program under which certain Borrowers will be offered payments, as set forth in Section 6.5.

W.   "*Freddie Mac*" means Federal Home Loan Mortgage Corporation.

X.   "*GSE*" means a government-sponsored enterprise such as Fannie Mae or Freddie Mac.

Y.   "*Interest Rate Floor*" means, with respect to modification of a Qualifying Mortgage hereunder, (a) a rate of 3.5% per annum if the modification results in an interest-only payment; or (b) a rate of 2.5% per annum if the modification results in a fully amortizing payment.

Z.   "*LTV*" means, with respect to a first-lien residential mortgage loan as of the time reviewed for eligibility for modification, the ratio of the unpaid principal balance of such mortgage loan to the Market Value of the residential property that secures such mortgage.

AA.   "*Market Value*" means, with respect to any residential mortgage loan, the value of the residential property that secures such mortgage loan as determined by a lender or servicer in reliance on an appraisal (whether based on a appraisal report prepared not more than 180 days before the date of determination, broker price opinion prepared

4

not more than 120 days before the date of determination or automated valuation model prepared not more than 90 days before the date of determination).

BB.   "*Pay Option ARMs*" means ARMs that, during an initial period (and subject to Recast), permit the borrower to choose among two or more payment options, including an interest-only payment and a minimum (or limited) payment.

CC.   "*Qualifying Mortgage*" has the meaning given to such term in Section 6.3.2.

DD.   "*Recast*" means, in the case of a Pay Option ARM, a contractual payment recast based on a negative amortization trigger.

EE.   "*Relocation Assistance payment*" has the meaning given to such term in Section 6.4.1.

FF.   "*Seriously Delinquent*" means, with respect to any residential mortgage loan, that payments of interest or principal are 60 or more days delinquent.

GG.   "*Seriously Delinquent Borrower*" means, with respect to any Borrower that, on or before the Termination Date, the related CFC Residential Mortgage Loan is Seriously Delinquent.

HH.   "*Subprime 2, 3, 5, 7 and 10 Hybrid ARMs*" means Subprime Mortgage Loans that are 2, 3, 5, 7 and 10 Hybrid ARMs.

II.   "*Subprime Mortgage Loans*" means first-lien residential mortgage loans that (a) combine higher risk features (such as low or no documentation, low equity, adjustable interest rates, prepayment penalties, cash-out financing) with higher risk borrower profiles (lower FICO scores, recent bankruptcies/foreclosures, major derogatory credit), resulting in a loan that could not reasonably be underwritten and approved as a "prime" loan.  An existing CFC Residential Mortgage Loan would be a "*Subprime Mortgage Loan*" if it is identified as such in connection with a securitization in which it is part of the pool of securitized assets or, in the case of a CFC Residential Mortgage Loan that is not included in a securitization, was classified as being "subprime" on the systems

5

STIPULATED JUDGMENT AND INJUNCTION

1    of CFC and its subsidiaries on June 30, 2008.  *"Subprime Mortgage Loans"* do not

2    include first-lien residential mortgage loans that are Federal Eligible.

3          JJ.    *"Termination Date"* means June 30, 2012.

4          4.    On July 1, 2008, Bank of America Corporation announced that it had completed its

5    purchase of Countrywide Financial Corporation, including Countrywide Home Loans.  In

6    connection with the acquisition, Bank of America announced that the Countrywide Defendants

7    would suspend offering Subprime, higher-cost or nontraditional mortgages that may result in

8    negative amortization, including Pay Option ARMs.  In addition, Bank of America also stated

9    that it would place restrictions on offering "low documentation" and "no documentation"

10   mortgage loans and set limits on mortgage broker compensation.

11         5.    All relief under Paragraphs 6 through 12 of this Judgment is ordered pursuant to

12   the Court's powers, including the Court's powers under sections 17203 and 17535 of the

13   California Business and Professions Code.

14         6.    *Agreements of the Parties.*

15         6.1    *CFC SOLE OBLIGOR ON ALL OBLIGATIONS IN THIS SECTION 6 OF*

16               *THIS STIPULATED JUDGMENT AND INJUNCTION.*

17         6.1.1    *Responsibility of CFC.*  Until the Termination Date (or such earlier date as

18   is specified herein), CFC is responsible to the other parties hereto for performance of all

19   of the undertakings in Section 6 of this Stipulated Judgment and Injunction, including the

20   changes to the residential mortgage lending practices described in Section 6.2, the loan

21   modification programs described in Section 6.3, the Relocation Assistance payments

22   described in Section 6.4, the Foreclosure Relief Program described in Section 6.5 and the

23   reporting obligations described in Section 6.6.

24         6.1.2    *Absence of Defenses.*  It is not a condition to the performance of the

25   obligations of CFC hereunder that it does not directly or indirectly engage in the business

26   of originating residential mortgage loans or in the business of servicing residential

27   mortgage loans.  CFC is responsible for the conduct of CFC Affiliates and CFC Servicers

28   as specified hereunder whether or not it controls such CFC Affiliates or CFC Servicers

6

STIPULATED JUDGMENT AND INJUNCTION

1    and the absence of such control shall not be a defense to or otherwise excuse CFC's

2    failure to perform hereunder.

3         6.1.3   *Remedies for Failure of CFC to Cause Performance.*   If there is a

4    material failure to perform the obligations under the loan modification programs described

5    in Section 6.3, the Relocation Assistance payments described in Section 6.4, the

6    Foreclosure Relief Program described in Section 6.5 or the reporting obligations described

7    in Section 6.6 and such failure is not promptly cured after notice by the Office of the

8    Attorney General of the State of California, then the Office of the Attorney General may

9    terminate Section 6 of this Stipulated Judgment and Injunction and is no longer bound by

10   the release set forth in Section 10 of this Stipulated Judgment and Injunction.

11   6.2   *SERVICER PRACTICES.*

12        Until the Termination Date, CFC shall be responsible for the implementation of the

13   following by CFC Affiliates with respect to CFC Residential Mortgage Loans with respect to

14   Borrowers in the State of California:

15        6.2.1   *Enhanced Home Retention Practices.*

16           (a)   CFC Servicers will maintain robust processes for early

17   identification and contact with Borrowers who are having, or may have, trouble

18   making their payments on CFC Residential Mortgage Loans.   Under these

19   processes, when contact is made with Delinquent Borrowers, an individualized

20   evaluation of the Borrowers' economic circumstances will be made to determine if

21   alternatives to foreclosure are available, and consistent with the directions of the

22   investors, if applicable.

23           (b)   CFC Servicers will maintain the current practice of offering

24   Delinquent Borrowers who desire to remain in their homes and who can afford to

25   make reasonable mortgage payments loan modifications or other workout

26   solutions, subject to applicable investor guidance and approvals.

27

28

(c)   CFC's reports to the State under this agreement will include information on the numbers and types of workouts concluded on loans secured by owner-occupied properties in the State of California.

(d)   CFC Servicers will continue the current practice of regularly monitoring the delinquency characteristics of the entire portfolio of CFC Residential Mortgage Loans, including Alt-A Residential Mortgage Loans, loans with interest-only features, and other loans to prime borrowers, to identify high-delinquency segments that may be appropriate for loan modification campaigns. CFC shall be responsible for providing reports to the Office of the Attorney General of the State of California on the delinquency characteristics of such loans, as provided herein.

(e)   With respect to Alt-A Residential Mortgage Loans, CFC acknowledges that Office of the Attorney General of the State of California has expressed concerns about future delinquencies, and agrees to provide the Office of the Attorney General a notification whenever the nationwide rate at which Borrowers on Alt-A Residential Mortgage Loans are 30 days or more delinquent in their payments exceeds 150% of the delinquency rate for comparably-aged FHA-insured loans serviced by CFC Servicers. If such notice is required, CFC agrees to confer with the Office of the Attorney General concerning Alt-A Residential Mortgage Loans delinquency trends, including whether delinquencies are isolated in certain segments of the Alt-A Residential Mortgage Loans portfolio (*e.g.,* loans with interest-only features, loans originated at high CLTV), and concerning the possible deployment of streamlined foreclosure avoidance solutions for such Borrowers.

(f)   Through July 1, 2009, a minimum of 3900 personnel shall be employed to assist Borrowers with loan modifications and other foreclosure avoidance measures.

8

6.2.2   *Compliance.*   Understanding the circumstances and behaviors of lenders and brokers that may have contributed, in part, to the current mortgage crises, CFC recognizes its responsibility to ensure the very highest degree of ethical conduct on the part of CFC's agents and employees. CFC shall ensure that (a) to the extent it resumes subprime lending, it will design and implement an effective compliance management program to provide reasonable assurance as to the identification and control of consumer protection hazards associated with such subprime lending activities, and (b) to the extent of its own lending activities (if any), it will create appropriate consumer safeguards to avoid unfair or deceptive activities or practices arising in connection with its interaction with brokers and other third parties.

6.3   *LOAN MODIFICATIONS FOR SERIOUSLY DELINQUENT BORROWERS IN CERTAIN MORTGAGE PRODUCTS.*

Until the Termination Date, CFC shall be responsible for ensuring that CFC Servicers do the following:

6.3.1   *Eligible Borrowers.*   An *"Eligible Borrower"* is a Borrower who has a Qualifying Mortgage with a first payment date on or before December 31, 2007, that (a) is secured by an owner-occupied 1-4 unit residential property, (b) is serviced by a CFC Servicer, and (c) in the event that it is determined that a condition described in Section 6.3.10 has occurred, the applicable CFC Servicer has determined that such Borrower is in financial distress. Eligible Borrowers are potentially eligible for loan modification relief under this Section 6.3. A Borrower who does not occupy the 1-4 unit residential property that secures the Qualifying Mortgage is not an *"Eligible Borrower."*

6.3.2   *Qualifying Mortgages.*   The following CFC Residential Mortgage Loans are *"Qualifying Mortgages"* if the Borrower is an Eligible Borrower and the Borrower meets one of the specified delinquency profiles:

(a)   *Subprime 2, 3, 5, 7 and 10 Hybrid ARMs.*   A Subprime 2, 3, 5, 7 and 10 Hybrid ARM shall be a Qualifying Mortgage if the Eligible Borrower

9

meets any one of the following delinquency profiles at the time considered for loan modification:

    *(1)*    The Eligible Borrower is a Seriously Delinquent Borrower and the LTV is 75% or more; or

    *(2)*    The Eligible Borrower is a Delinquent Borrower and the LTV is 75% or more.

    (b)    ***Pay Option ARMs.***  A Pay Option ARM shall be a Qualifying Mortgage if the Eligible Borrower meets any one of the following delinquency profiles at the time considered for loan modification:

    *(1)*    The Eligible Borrower is Seriously Delinquent and the LTV is 75% or more; or

    *(2)*    The Eligible Borrower is a Delinquent Borrower and the LTV is 75% or more.

    (c)    ***Subprime First Mortgage Loans (Other than Hybrid 2, 3, 5, 7 and 10 ARMs).***  A Subprime CFC Residential Mortgage Loan shall be a Qualifying Mortgage if the Eligible Borrower is a Seriously Delinquent Borrower and the LTV is 75% or more.

    6.3.3  ***Loan Modifications to Be Considered.***  Each Eligible Borrower shall be considered for a range of affordable loan modification options with respect to his or her Qualifying Mortgage. The loan modification options will include those described below and existing modification options currently undertaken by CFC, and are subject, as applicable, to approval of the investor who owns the Qualifying Mortgage consistent with the Affordability Equation, as set forth in Section 6.3.4. Loan modification options for each category of Qualifying Mortgages are as follows:

    (a)    ***Subprime Hybrid 2, 3, 5, 7 and 10 ARMs.***  Qualifying Mortgages that are Subprime Hybrid 2, 3, 5, 7 and 10 ARMs will be eligible for loan modifications as follows:

STIPULATED JUDGMENT AND INJUNCTION

(1)    To the extent the HOPE for Homeowners Program is available, an FHA refinancing under the HOPE for Homeowners Program under the underwriting criteria applicable to that program.

(2)    For Eligible Borrowers who are Delinquent Borrowers, an unsolicited (subject to Section 6.3.10) restoration of the introductory rate for five years, without new loan documentation or an evaluation of the Eligible Borrower's current income.    Communications to Eligible Borrowers informing them of this modification will invite Eligible Borrowers to contact the applicable CFC Servicer if they do not believe they will be able to afford the introductory rate in order to be considered for more extensive relief under Section 6.3.3(a)(3).

(3)    A streamlined, fully-amortizing loan modification subject to the Affordability Equation consisting of:

(a)    until the fifth anniversary of the loan modification, a reduction of the interest rate to the (1) introductory rate or (2) lower (but not less than 3.5%); and

(b)    on the fifth anniversary of the loan modification, an automatic conversion to a fixed rate mortgage for the remainder of the loan term at the higher of (1) the Fannie Rate and (2) the introductory rate.  If the Fannie Rate option applies and would not be affordable to the Eligible Borrower based on his or her income at the time of conversion, the Eligible Borrower will be considered for a single two year period of reduced-rate financing (in which case the conversion to a fixed rate mortgage will occur at the end of the seventh year).

(4)    A streamlined loan modification subject to the Affordability Equation consisting of:

11

1                 (a)     modification of the Qualifying Mortgage to include a

2 ten-year interest-only period;

3                 (b)     reduction of the interest rate to a rate no lower than

4 the Interest Rate Floor, with an Annual Increase subject to an

5 interest-rate cap as provided below in Section 6.3.3(a)(4)(c); and

6                 (c)     an interest-rate cap for the remaining, fully-

7 amortizing term of the Qualifying Mortgage at an annual interest

8 rate equal to the introductory rate.

9      (b)    ***Pay Option ARMs.***  Qualifying Mortgages that are Pay Option

10 ARMs are eligible for the following loan modifications:

11              *(1)*     To the extent the HOPE for Homeowners Program is

12 available, an FHA refinancing under the HOPE for Homeowners Program

13 under the underwriting criteria applicable to that program; or

14              *(2)*     A streamlined loan modification subject to the Affordability

15 Equation consisting of:

16                 (a)     elimination of the negative amortization feature;

17                 (b)     optional introduction of a ten-year interest-only

18 period on the loan;

19                 (c)     reduction of the interest rate to a rate no lower than

20 the Interest Rate Floor, with an Annual Increase subject to an

21 interest rate cap of 7%; and

22                 (d)     if the Eligible Borrower owns only one residential

23 property and the LTV is 95% or higher, a write down of the

24 principal balance of the Qualifying Mortgage (but any write down

25 of principal would not be in an amount greater than necessary to

26 achieve an LTV of 95%).

27

28

1         (c)     *Subprime Loans (Other than Hybrid 2, 3, 5, 7 and 10 ARMs).*

2   Qualifying Mortgages that are Subprime Loans (Other than Hybrid 2, 3, 5, 7 and

3   10 ARMs) are eligible for the following loan modifications:

4         *(1)*     To the extent the HOPE for Homeowners Program is

5   available, an FHA refinancing under the HOPE for Homeowners Program

6   under the underwriting criteria applicable to that program; or

7         *(2)*     A streamlined loan modification within the limits of the

8   Affordability Equation consisting of:

9         (a)     optional introduction of a ten-year interest-only

10   period on the loan;

11         (b)     reduction of the interest rate on the mortgage to a

12   rate no lower than the Interest Rate Floor, with an Annual Increase

13   subject to an interest rate cap as provided below in Section

14   6.3.3(c)(2)(c); and

15         (c)   an interest-rate cap for the remaining term of the

16   Qualifying Mortgage at an annual interest rate equal to (i) the fixed

17   interest rate *less* 200 basis points, in the case of fixed-rate loans,

18   and (ii) the remainder of the sum of the contractual index amount

19   *plus* spread immediately before the first loan modification, *minus*

20   200 basis points, in the case of an ARM.

21   6.3.4   *Affordability Equation.*   Qualifying Mortgages will be considered for loan

22   modifications in accordance with the following Affordability Equation, which establishes

23   a Foreclosure Avoidance Budget that is a cap on the cost of the loan modification.

24         (a)     *Foreclosure Avoidance Budget.*   Except for Eligible Borrowers

25   who receive a streamlined reduction of their interest rates pursuant to Section

26   6.3.3(a)(2), a Foreclosure Avoidance Budget will be prepared with respect to the

27   Eligible Borrower and the Qualifying Mortgage.   The *"Foreclosure Avoidance*

28   *Budget"* at any time is the difference between (i) the likelihood and severity of the

<div align="center">13</div>

projected loss in a foreclosure sale and (ii) the likelihood and severity of the projected loss in the event that there was a loan modification with respect to the Qualifying Mortgage and a later foreclosure sale. For purposes of determining the Foreclosure Avoidance Budget for a Qualifying Mortgage, the LTV will be based on the Market Value.

(b)   *Affordability Criteria.*

*(1)*   Subject to the Foreclosure Avoidance Budget, if tax and insurance escrows are maintained with respect to the Qualifying Mortgage, the Eligible Borrower will be offered a loan modification that produces a first-year payment of principal (if applicable), interest, taxes and insurance equating to 34% of the Eligible Borrower's income, or as close to 34% of the Eligible Borrower's income as the Foreclosure Avoidance Budget permits without exceeding 42% of the Eligible Borrower's income.

*(2)*   Subject to the Foreclosure Avoidance Budget, if tax and insurance escrows are not maintained with respect to a Qualifying Mortgage, the Eligible Borrower will be offered a loan modification that produces a first-year payment of principal (if applicable) and interest equating to 25% of the Eligible Borrower's income, or as close to 25% of the Eligible Borrower's income as the Foreclosure Avoidance Budget permits without exceeding 34% of the Eligible Borrower's income.

(c)   *Borrowers Who Cannot Afford a Loan Modification.* There is no obligation to offer loan modifications with respect to Qualifying Mortgages if the Eligible Borrower cannot be qualified under the Affordability Equation. Such Eligible Borrowers may be eligible for a Relocation Assistance payment or a payment under the Foreclosure Relief Program, all as provided in Sections 6.4 and 6.5.

6.3.5   *Outreach to Borrowers at Risk of Delinquency.* Borrowers under Subprime Mortgage Loans or Pay Option ARMs with first-payment due dates between

14

STIPULATED JUDGMENT AND INJUNCTION

January 1, 2004 and December 31, 2007, whose payments are scheduled to change as a result of an interest-rate reset, Recast, or expiration of an interest-only term, will be sent a communication approximately ninety (90) days before the payment change inviting them to contact their CFC Servicer if they believe they will not be able to afford their new payments. In the event that a borrower responds to this communication, the borrower will be considered for loan modifications under the eligibility criteria in Section 6 of this Stipulated Judgment and Injunction.

6.3.6 *Restrictions on Initiation or Advancement of Foreclosure Process for Eligible Borrowers.*

(a)    The foreclosure process for a Qualifying Mortgage of an Eligible Borrower will not be initiated or advanced for the period necessary to determine such Eligible Borrower's interest in retaining ownership and ability to afford the revised mortgage terms, as well as the investor's willingness to accept a loan modification.

(b)    Any such foreclosure process will be initiated or advanced only if:

*(1)*    it is determined, based on communication with the Borrower or based on the Borrower's abandonment of the residential property that secures the mortgage loan, that the Borrower does not wish to retain ownership of the residence that secured the mortgage loan;

*(2)*    it is or has been determined that the Borrower cannot be qualified for, or has refused, a loan modification under Section 6 of this Stipulated Judgment and Injunction within the limits of the Affordability Equation, as applicable; or

*(3)*    despite reasonable efforts, servicing agents have been unable to make contact with the borrower to determine his or her preferences with regard to home ownership, or to obtain information concerning his or her income and ability to afford a mortgage payment under a modification.

15

STIPULATED JUDGMENT AND INJUNCTION

6.3.7    *Miscellaneous Provisions Related to Loan Modification Program.*

(a)    *Commitment to Waive Late/Delinquency Fees.* Any late/delinquency fees associated with overdue loan payments remaining unpaid as of the date immediately before modification of the Qualifying Mortgage under Section 6 of this Stipulated Judgment and Injunction will be waived.

(b)    *Commitment Not to Charge Loan Modification Fees.* Except to the extent required in connection with the HOPE for Homeowners Program, Eligible Borrowers will not be charged loan modification fees in connection with loan modifications of Qualifying Mortgages hereunder.

(c)    *Prepayment Penalty Waivers.* Prepayment penalties will be waived in connection with any payoff or refinancing (even if refinanced by a person not Affiliated with CFC) of a Qualifying Mortgage that is a Subprime Mortgage Loan or Pay Option ARM that (i) had a first payment due date between January 1, 2004 and December 31, 2007, (ii) was directly or indirectly held by CFC on June 30, 2008, and (iii) which at the time of the payoff or refinancing is held by CFC or any Affiliate. Investor owners or their representatives of Qualifying Mortgages that are Subprime Mortgage Loans or Pay Option ARMs serviced by a CFC Servicer will be encouraged to waive prepayment penalties in such circumstances.

(d)    *Commitment to Consider Additional Relief for Borrowers Receiving Modifications and Later Becoming Delinquent.* Eligible Borrowers with respect to Qualifying Mortgages who have earlier received loan modifications or other workouts, whether or not pursuant to Section 6 of this Stipulated Judgment and Injunction, will be eligible to be considered for new loan modification offers under Section 6 of this Stipulated Judgment and Injunction if they otherwise satisfy the eligibility criteria.

(e)    *Representation Concerning Investor Delegation and Approval.* CFC represents that CFC Servicers currently have, or reasonably expect to obtain,

16

3b06e28407211593

discretion to pursue the foreclosure avoidance measures outlined in Section 6 of this Stipulated Judgment and Injunction for a substantial majority of Qualifying Mortgages. If CFC Servicers do not have discretion to pursue these foreclosure avoidance measures, best efforts will be used to obtain appropriate investor authorization.

6.3.8   *Commitment to Implement Relief Measures Authorized by Federal Government.*

(a)   *Government Acquisition of Qualifying Mortgages.* To the extent the federal government acquires any Qualifying Mortgages and, as the owner of these mortgages, authorizes loan modifications that offer borrower benefits greater than those associated with the modifications outlined in Section 6 of this Stipulated Judgment and Injunction, relief measures will be pursued in modifying such Qualifying Mortgages to the full extent of such authorization.

(b)   *Government-Issued Guidelines Relating to Loan Modifications.* To the extent any federal agency, in connection with its intervention in the secondary mortgage market or otherwise having jurisdiction, issues guidelines relating to modifications of delinquent mortgages, Section 6 of this Stipulated Judgment and Injunction will be implemented in a manner that, to the maximum extent feasible, produces modifications consistent with such guidelines.

6.3.9   *Timeframe for Loan Modification Process.* The loan modification process will be managed to ensure that offers of loan modifications under Section 6 of this Stipulated Judgment and Injunction (other than unsolicited interest rate reductions) are made to Eligible Borrowers, on average, no more than 60 days after such Eligible Borrowers make contact with the applicable CFC Servicer and provide any required information concerning a possible modification.

6.3.10   *Response to Intentional Nonperformance by Borrowers.* If CFC detects material levels of intentional nonperformance by Eligible Borrowers that appears to be attributable to the introduction of the loan modification program, it reserves the right to

17

require objective prequalification of Eligible Borrowers for loan modifications under the program by obtaining verification of all sources of income and the application of funds, and to take other reasonable steps. Such prequalification could result in the elimination of unsolicited interest rate reductions, inhibit streamlined solutions and could otherwise significantly slow implementation of the loan modification program.

6.3.11 *No Releases with Respect to Loan Modifications.* There will be no requirement that Eligible Borrowers release claims against CFC or any CFC Affiliate in connection with loan modifications offered under Section 6 of this Stipulated Judgment and Injunction.

6.3.12 *Number of Loan Modification Offers before March 31, 2009.* On or before March 31, 2009, loan modifications will be offered by CFC Servicers in accordance with Section 6 of this Stipulated Judgment and Injunction to not fewer than 50,000 Seriously Delinquent Borrowers on a nationwide basis. The Office of the Attorney General of the State of California may terminate Section 6 of this Stipulated Judgment and Injunction and no longer be bound by the release set forth in Section 10 of this Stipulated Judgment and Injunction if there is a material failure to satisfy this commitment. If the Office of the Attorney General terminates Section 6, any portion of the Foreclosure Relief Program allocation that has not been paid to Eligible Borrowers as provided in Section 6.5.2 of this Stipulated Judgment and Injunction will revert to CFC.

6.3.13 *Second or Junior Liens.* Loan modifications contemplated in Section 6 of this Stipulated Judgment and Injunction shall be made without consideration of second or junior liens on mortgaged properties. CFC does not expect that the presence of second or junior liens will impede Eligible Borrowers from receiving a loan modification offer under Section 6 of this Stipulated Judgment and Injunction.

6.4   *RELOCATION ASSISTANCE PROGRAM.*

Through the Termination Date, payments will be provided to borrowers who are unable to retain their homes in accordance with this Section 6.4.

18
STIPULATED JUDGMENT AND INJUNCTION

6.4.1   *Eligibility.*   Borrowers under CFC Residential Mortgage Loans that were serviced by a CFC Servicer on June 30, 2008 (whether or not they are Qualifying Mortgages), are currently serviced by a CFC Servicer and are subject to a foreclosure sale date on or before the Termination Date, will be offered an agreement under which they can receive a cash payment to assist with the Borrower's transition to a new place of residence ("*Relocation Assistance payment*") in exchange for voluntarily and appropriately surrendering the residence that secures the mortgage loan at the time of the foreclosure sale.   Borrowers who are eligible for, or receive, payments under the Foreclosure Relief Program may also receive a Relocation Assistance payment.

6.4.2   *Amount.*   The amount of Relocation Assistance payments offered to any Borrower will be in the discretion of CFC or its delegee according to its or their assessment of the individual circumstances of the Borrower (*e.g.*, number of dependents or amount of moving expenses).

6.4.3   *Timing of Payments.*   Relocation Assistance payments shall be made to a Borrower no later than fourteen days following the Borrower's voluntary and appropriate surrender of the residence that secures the mortgage loan.

6.4.4   *Payment Projection.*   CFC projects that, from October 1, 2008, through December 31, 2010, Relocation Assistance payments will be made to 35,000 borrowers on a nationwide basis in a total amount of more than $70,000,000.

6.5   *FORECLOSURE RELIEF PROGRAM.*

Payments shall be made available to borrowers who experienced a foreclosure sale, or who were 120 days or more delinquent in making mortgage payments soon after their loans were originated, in accordance with this Section 6.5.

6.5.1   *Payment.*   California is allocated $27,950,101.

6.5.2   *Individual Allocation.*   A Borrower will be eligible for payments under the Foreclosure Relief Program if the Borrower:

(a)   Has a CFC-Originated Residential Mortgage Loan secured by owner-occupied property;

19

(b)     The first payment on the CFC-Originated Residential Mortgage Loan was due between January 1, 2004 and December 31, 2007;

(c)     Six or fewer payments were made on the CFC-Originated Residential Mortgage Loan; and

(d)     The CFC-Originated Residential Mortgage Loan was foreclosed or is 120 days or more delinquent as of the Commencement Date.

6.5.3   *Expansion of the Foreclosure Relief Program.*   The Office of the Attorney General of the State of California may expand the Foreclosure Relief Program to cover additional Borrowers or limit the Foreclosure Relief Program to restrict the participation of Borrowers (provided that at least those borrowers who made three or fewer payments over the life of the CFC-Originated Residential Mortgage Loan are covered).

6.5.4   *Communications.*   CFC and the Office of the Attorney General of the State of California shall consult as to the form of any communication sent to Borrowers who are to receive Foreclosure Relief Program payments.

6.5.5   *Unallocated Funds.*   Funds allocated to Borrowers in the State of California who choose not to participate in the Foreclosure Relief Program or who cannot be located after commercially reasonable efforts shall be available to the Office of the Attorney General for re-allocation to Borrowers under this program at the direction of the Office of the Attorney General.

6.5.6   *Release.*   In order to receive payments under the Foreclosure Relief Program, Borrowers will be required to execute a release in accordance with Section 6.7.1. Borrowers offered payments under this Foreclosure Relief Program whose loans have not yet been foreclosed shall be afforded at least a three month period to decide whether to execute the release to permit them to determine whether they wish to raise claims covered by the release.

6.6   **REPORTING REQUIREMENTS.**

6.6.1   *Eligible Borrowers in Qualifying Mortgages.*

20

(a)   On a quarterly basis through June 30, 2010, CFC shall report the following information to the Office of the Attorney General of the State of California:

(1)   The names and addresses of Eligible Borrowers in the State of California in Qualifying Mortgages who received loan modification offers under Section 6 of this Stipulated Judgment and Injunction, and for whom loan modifications were concluded;

(2)   For all loan modifications under Section 6 of this Stipulated Judgment and Injunction concluded within the reporting period in the State of California, the original and modified loan terms, and the amounts of late/delinquency fees waived, loan modification fees waived, and prepayment penalties waived by CFC pursuant to Section 6 of this Stipulated Judgment and Injunction;

(3)   For a sample of Eligible Borrowers in Qualifying Mortgages for whom CFC was unable to procure a loan modification offer under Section 6 of this Stipulated Judgment and Injunction during the reporting period (which sample shall be no less than 5% of all such Eligible Borrowers), the factors preventing a loan modification offer;

(4)   The number and total amount of Relocation Assistance payments made to borrowers in the State of California during the reporting period;

(5)   Delinquency data on active loans with first payment due dates between January 1, 2004, and December 31, 2007, that are secured by owner occupied residential property in the State of California, broken down by type of loan; and

(6)   Aggregated delinquency data on all loans modified under Section 6 of this Stipulated Judgment and Injunction for Eligible Borrowers in the State of California.

21

(b)    CFC shall provide annual reports to the Office of the Attorney General of the State of California that include the information specified in Section 6.6.1(a) for the periods July 1, 2010 through June 30, 2011, and July 1, 2011 through June 30, 2012.

6.6.2    *Other Loan Modifications.*    With the same frequency as specified in Section 6.6.1, CFC will provide to the Office of the Attorney General of the State of California a report detailing the numbers and types of modifications concluded on first-lien residential mortgage loans secured by owner-occupied property in the State of California (other than Qualifying Mortgages) and the total unpaid principal balance of such modified loans.

6.6.3    *Compliance Monitor.*    CFC will appoint an employee as the Compliance Monitor for this agreement.  The Compliance Monitor will be responsible for (a) making reports to the Office of the Attorney General of the State of California under this Stipulated Judgment and Injunction and (b) receiving and responding to complaints from States or from individual borrowers concerning the operation of the loan modification program.

6.7    *RELEASES*

6.7.1    *Releases from Borrowers.*    Borrowers to whom payments under the Foreclosure Relief Program are offered shall, as a condition of receiving such payments, be required to execute and return to CFC a release of claims that includes the following language:

In consideration for the payment we are to receive under the Foreclosure Relief Program, we release Countrywide Financial Corporation and its affiliates and their respective directors, officers, employees and agents (except brokers) from all civil claims, causes of action, any other right to obtain any type of monetary damages (including punitive damages), expenses, attorneys' and other fees, rescission, restitution or any other remedies of whatever kind at law or in equity, in contract, in tort (including, but not limited to, personal injury and emotional distress),

22

arising under any source whatsoever, including any statute, regulation, rule, or common law, whether in a civil, administrative, arbitral or other judicial or non-judicial proceeding, whether known or unknown, whether or not alleged, threatened or asserted by us or by any other person or entity on our behalf, including any currently pending or future purported or certified class action in which we are now or may hereafter become a class member, that arise from or are in any way related to CFC Loan No. _____, including, without limitation, the origination of that loan (and any representations or omissions made during that origination process), the terms and conditions of that loan, and the servicing or administration of that loan following its origination.

6.8   *Miscellaneous.*

6.8.1   *No Third Party Beneficiaries Intended.*   Section 6 of this Stipulated Judgment and Injunction is not intended to confer upon any person any rights or remedies, including rights as a third party beneficiary.   Section 6 of this Stipulated Judgment and Injunction is not intended to create a private right of action on the part of any person or entity other than the parties hereto.

6.8.2   *Confidentiality.*   The Office of the Attorney General of the State of California agrees that all confidential information disclosed to it by BAC or CFC or any of their Affiliates shall be kept confidential, except to the extent required by law, regulation or court order (and in such case, only upon prior written notice to the disclosing party). The periodic reports to be provided pursuant to Section 6.6 of this Stipulated Judgment and Injunction shall be considered records of an investigation conducted by the Office of the Attorney General.

7.   Except to the extent an earlier date is specified or the provisions of Section 6 of this Stipulated Judgment and Injunction are earlier terminated according to the terms hereof, the obligations of CFC under Section 6 of this Stipulated Judgment and Injunction shall terminate on the Termination Date.   Provided, however, that no termination of the obligations under Section 6 of this Stipulated Judgment and Injunction shall modify or terminate the terms of any

23

1    loan modification entered into pursuant to Section 6.3 of this Stipulated Judgment and

2    Injunction.

3           8.     On entry of this Stipulated Judgment and Injunction, CFC shall pay the sum of

4    $1,700,000 to the Office of the Attorney General, to cover the costs of investigating and

5    prosecuting this matter.

6           9.     All documents and notices to be provided to any party under this Judgment are

7    sufficient if given by nationally recognized overnight courier service or personal delivery to the

8    named party at the address below:

9

10          A.     If to Defendants:

11   John Beisner
     Brian Boyle
12   O'MELVENY & MYERS LLP
     1625 Eye Street, N.W.
13   Washington, D.C. 20006

14

          B.     If to the Attorney General:
15

16   Benjamin G. Diehl
     Office of the California Attorney General
17   300 S. Spring St., Ste. 1702
     Los Angeles, CA 90013
18

19   and

20   Kathrin Sears
     Office of the California Attorney General
21   455 Golden Gate Ave., Ste. 11000
     San Francisco, CA 94102

22   Notice is effective when delivered personally or on the business day after it is sent by nationally

23   recognized courier service for next day delivery. Any party may designate some other person to

24   receive Reports or notices or change its notice address by giving notice in accordance with this

25   paragraph.

26          10.    This Stipulated Judgment and Injunction constitutes a full resolution, complete

27   settlement, and release of all claims as between Plaintiff the People the State of California and

28   the Countrywide Defendants regarding the business practices identified in the above captioned

                                                24

1  action for events occurring before the entry of this Stipulated Judgment and Injunction. This

2  Stipulated Judgment and Injunction does not resolve or release, but instead specifically

3  preserves, any claims Plaintiff the People of the State of California may have as to Angelo

4  Mozilo or David Sambol.

5          11.     The Countrywide Defendants shall maintain and provide information to and

6  cooperate fully with the Attorney General in connection with the prosecution of the separate

7  action, *People of the State of California v. Countrywide Financial Corporation, et al.,* initially

8  filed in this court and assigned case number LC081846, as to defendants Angelo Mozilo and

9  David Sambol. This shall include, but is not necessarily limited to, attending depositions, trials

10  or hearings on 25-days notice, without the necessity of a subpoena or personal service;

11  providing any documents and other tangible things requested by the Attorney General on 30-

12  days notice, without the necessity of a subpoena or personal service and without objection; not

13  objecting to efforts by the Attorney General to obtain documents or other discovery from any

14  other named defendant to this action or any third party; and protecting, preserving and

15  maintaining all records and correspondence which are now in or later come into their

16  possession, custody or control, that were sent to, received from, or in any way relate to Angelo

17  Mozilo, David Sambol, or any of their representatives.

18          12.     Plaintiff and the Countrywide Defendants agree that nothing in this Stipulated

19  Judgment and Injunction as to such defendants is to be construed as a bar to Plaintiff continuing

20  its separate action against defendants Angelo Mozilo, David Sambol, and Does 1-100,

21  inclusive.

22          13.     Should any of the Countrywide Defendants resolve matters specifically set forth

23  in the allegations of the Complaint filed in this action for conduct which occurred before the

24  entry of this Stipulated Judgment and Injunction in actions brought by Attorneys General of

25  other states on terms that are different than those contained in this Stipulated Judgment and

26  Injunction (other than terms offered by CFC but not accepted by the Office of the Attorney

27  General of the State of California), the Countrywide Defendants will provide a copy of those

28  terms to the Office of the Attorney General for review. If, after review, the Office of the

25

STIPULATED JUDGMENT AND INJUNCTION

1    Attorney General determines the terms of such resolutions are, taken as a whole, more

2    favorable than those contained in this Stipulated Judgment and Injunction, then the

3    Countrywide Defendants shall stipulate that this Stipulated Judgment and Injunction shall be

4    amended to reflect all of such terms in place of the terms hereof.

5         14.     Nothing in this Stipulated Judgment and Injunction shall be construed as

6    relieving any of the parties subject to this Stipulated Judgment and Injunction of their obligation

7    to comply, or as prohibiting any of those parties from complying, with all applicable state and

8    federal laws, regulations or rules, nor shall any of the provisions of this Stipulated Judgment

9    and Injunction be deemed to be permission to engage in any acts or practices prohibited by such

10    laws, regulations, or rules.

11         15.     This Court shall retain jurisdiction over this matter for the purposes of (a)

12    enabling the Attorney General to apply, at any time, for enforcement of any provisions of this

13    Stipulated Judgment and Injunction and for sanctions or other punishment for any violation of

14    this Stipulated Judgment and Injunction; and (b) enabling any party to this Stipulated Judgment

15    and Injunction to apply, upon giving 45 days written notice to all other parties, for such further

16    orders and directions as might be necessary or appropriate either for the construction or

17    carrying out of this Stipulated Judgment and Injunction or for the modification or termination of

18    one or more injunctive provisions of this Stipulated Judgment and Injunction.

19         16.     This Stipulated Judgment and Injunction shall take effect immediately upon

20    entry by the clerk, and the clerk is ordered to enter it forthwith.

21

22    Dated:     OCT 2 0 2008

23                      Hon. _____

Judge, California Superior Court

RICHARD B. WOLFE
JUDGE

26

STIPULATED JUDGMENT AND INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## PROOF OF SERVICE

### Wise v. Wells Fargo Bank N.A., et al
### United States District Court Central District of California
### CV11-8586 SJO (PJWx)

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is Prosper Law Group, LLP, Suite 1050, Los Angeles, California 90045.  On December 5, 2011, I served the following document(s) by the method indicated below:

### FIRST AMENDED COMPLAINT

[ ]     BY CM/ECF ELECTRONIC DELIVERY: In accordance with the registered case participants and in accordance with the procedures set forth at the United States District Court, Central District of California website www.ecf.cacd.uscourts.gov.

[X]    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.  I am readily familiar with the firm's practice of collection and processing of correspondence for mailing.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date on postage meter date is more than one day after the date of deposit in this Declaration.

[ ]     by placing the documents(s) listed above in sealed envelope(s) and by causing personal delivery of the envelope(s) to the person(s) at the address(es) set forth below.  A signed proof of service by the process server or delivery service will be filed shortly.

### [See attached Service List]

I declare under penalty of perjury under the laws of the United States that the above is true and correct.  Executed on December 5, 2011, at Los Angeles, California.

Brittany Auchard

1

<u>Service List</u>

### <u>Wise v. Wells Fargo Bank N.A., et al</u>
### <u>United States District Court Central District of California</u>
### <u>CV11-8586 SJO (PJWx)</u>

<u>Attorney for Defendants WELLS FARGO BANK, N.A.; U.S. BANK, N.A. AS TRUSTEE FOR CITIGROUP MORTGAGE LOAN TRUST, INC., MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-AR9</u>

Suzanne M. Hankins, Esq.
Jarlath M. Curran., Esq.
SERVESON and WERSON
A Professional Corporation
The Atrium
19100 Von Karman Ave., Suite 700
Irvine, CA 92612

Mark D. Lonergan, Esq.
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center Suite 2600
San Francisco, CA 94111

2

PROOF OF SERVICE